THE NORTH NOONDAY MINING CO. *v.* THE ORIENT MINING CO.

*(Circuit Court, D. California.   March 4, 1880.)*

ONLY CITIZENS CAN LOCATE MINING CLAIMS.—Under the act of congress
    of May 10, 1872, relating to the public mineral lands, none but citizens
    of the United States, and those who have declared their intention to be-
    come such, can acquire any right to such lands by location.

HOW NATURALIZED, AND MODE OF PROOF.—A foreign born son of an alien
    may become a citizen by being naturalized, or by the naturalization of his
    father, during his minority ; but whether he or his father was so natural-
    ized or not, is a question of fact for the jury ; and, as tending to prove
    that fact, the affidavit of the party himself is competent evidence for
    all purposes of said act of May 10, 1872.

POWER OF MINERS TO LIMIT WIDTH OF LODE CLAIMS.—By implication,
    the act of May 10, 1872, confers upon the miners the right to limit the
    width of a lode claim to 25 feet on each side of the middle of the vein.

MINERS' RULES MUST BE IN FORCE.—But, to be of any validity, a rule or
    custom of miners must not only be established or enacted, but must be
    *in force* at the time and place of the location.   It does not, like a stat-
    ute, acquire validity by the mere enactment, but from customary obe-
    dience and acquiescence of the miners.   It is void whenever it falls into
    disuse, or is generally disregarded.

QUESTION OF FACT.—It is a question of fact for the jury whether or not
    a mining law or custom is in force; but, when shown to have been in
    force, the presumption is that it continues in force until the contrary
    is proved; and parol evidence is admissible to show whether the rule or
    custom is in force or not.

DEFINITION OF VEIN OR LODE.—A vein or lode authorized to be located is
    a seam or fissure in the earth's crust filled with quartz, or some other
    kind of rock, in place, carrying gold, silver, or other valuable mineral
    deposits named in the statute.   It may be very thin or many feet thick,
    or irregular in thickness ; and it may be rich or poor, provided it con-
    tains a trace of any of the metals named in the statute.

DISCOVERY OF A VEIN.—No rights can be acquired, under the statute, by
    location, before the discovery of a vein or lode within the limits of the
    claim located.

DISCOVERY OF VEIN AFTER LOCATION.—But a location is made valid by
    the discovery of a vein or lode at any time after the location, provided
    that such discovery is made before any valid location of the same claim
    by other persons.

OTHER VEINS THAN THOSE DISCOVERED.—Where a valid location is made
    upon a vein or lode discovered, the locator is not only entitled to the vein
    discovered, but to every other vein and lode throughout its entire depth,
    the top or apex of which lies within the surface lines of the claim ex-

tended vertically downwards, to which no right had attached in favor of other parties at the time the location became valid, although such veins or lodes may so far depart from a perpendicular as to extend outside of the vertical side lines.

How Location to be Marked.—A location of a mining claim must be distinctly marked on the ground, so that its *boundaries* can be readily traced, but the law does not define or prescribe what kind of marks shall be made, or upon what part of the ground or claim they shall be placed. Any marking on the ground claimed, by stakes, mounds and written notices, whereby the *boundaries* can be readily traced, is sufficient. If the center line of a location of a lode claim, lengthwise, be marked by a prominent stake or monument at each end thereof, upon one of which is placed a written notice showing that the locator claims the length of said line upon the lode, from stake to stake, and a specified number of feet in width on each side of said line, such location is so marked that the boundaries may be readily traced; and, so far as the marking of the location is concerned, is a sufficient compliance with the law.

Right of Subsequent Locator to Object.—A subsequent locator has no right to object that the first location was not sufficiently marked on the ground at the time of the location, or before recording, provided that such first location was sufficiently marked on the ground before any valid subsequent location of the same claim.

As to Record of a Mining Claim.—Where a rule or custom of miners, in force, requires a location to be recorded, such recording is necessary; otherwise, not. To make a valid record it must contain the names of the locators, the date of the location, and such a description of the claim, by reference to some natural or permanent monument, as will identify the claim; but such natural objects or permanent monuments are not required to be on the ground located, although they may be, and the natural object may consist of any fixed natural object, and such permanent monument may consist of a prominent post or stake firmly planted in the ground, or of a shaft sunk in the ground. If, by reference to any such natural object or permanent monument, the claim recorded can be identified with reasonable certainty, the record will be sufficient in this particular; otherwise, not.

Work Necessary to Hold a Claim.—The statute requires $100 worth of work on each claim located after May 10, 1872, in each year, and in default thereof authorizes the claim to be relocated by other parties, provided the first locator has not resumed work upon it. But if the first locator resumes work at any time after the expiration of the year, and before any relocation is made, he thereby preserves his right to the claim; and no other person has any right to relocate it after such resumption of work, in good faith, by the first locator, even though the latter had failed to perform any work for the period of one year or more immediately before he resumed work.

As to Location and Sale by an Alien.—If, in the attempt by an alien to locate a claim, he performs all the acts necessary to a valid location by a citizen, and then conveys such claim to a citizen, who takes possession and continues to perform all the conditions required by law to hold such claim, such citizen thereby acquires and holds a valid title to the claim so located by the alien, as against all persons having acquired no right therein before such conveyance by the alien.

Joint Location by Citizen and Alien.—If a citizen and an alien jointly locate a claim, not exceeding the amount of ground allowed by law to one locator, such location is valid as to the citizen, and a conveyance from both of such locators to a citizen gives a valid title.

Corporation when Deemed a Citizen.—A corporation organized and existing under the laws of California, is to be deemed a citizen in the sense of the act of congress of May 10, 1872.

What is Actual Possession.—A person who has purchased a mining claim which had been properly located and marked out on the ground, and who is, personally or by agents, upon the claim, working and developing it, and keeping up the boundary stakes and marks thereof, is not merely in the constructive possession of such claim, by virtue of mining laws, but is in the actual possession of the whole claim. Such possession is a *possessio pedis*, extending to the boundary lines of the claim.

This was an action in the nature of an action of trespass upon a lode mining claim, in the Bodie mining district, California, in which the defendant pleaded title to the *locus in quo*.

The case was removed from the state court to the circuit court of the United States, where it was tried by a jury.

*Stewart, Vanclief & Herrin,* for plaintiff.

*R. M. Clark* and *George B. Merrill,* for defendant.

Sawyer, J., (*in charging jury.*) Gentlemen of the jury, I congratulate you that we are approaching the conclusion of this trial. It has run through many days, but has not been without interest.

The questions that have been presented are many, and some of them difficult; but the case has been thoroughly prepared. It has been zealously, exhaustively, and ably tried and argued on both sides. Whatever great ability, great zeal, thorough preparation, and a thorough knowledge of the subject is able to contribute, has been contributed to explain and illustrate this case. Science has also been called into exercise. You have had a glass model here, which shows you the internal condition of these mines. You have had another

model which exhibits to your view the shafts, drifts, cross-cuts, veins and their connections, in their proper location, and illustrates to you all the workings of the mines. You have had diagrams, also, exhibiting the same workings in that form, and everything, indeed, which could be desired to throw light on the subject, has been prepared and arranged and presented for your consideration and the consideration of the court.

Counsel having ably discharged their duty, it now devolves on the court to state to you the law governing this case; and then it will be your duty, gentlemen, and your province, to determine the facts. The questions of fact are for you to determine; the weight to be given to the evidence, the credibility to be given to the witnesses; and everything relating to a disputed question of fact is for your sole consideration and determination.

If I state the testimony, I shall only do it for the purpose of calling your attention to it and stating its tendency; but I shall not go over it fully. If I intimate an opinion on a question of fact, you are not to be governed by it, unless it corresponds with your own ideas as to what the facts are. If I make a mistake in stating the testimony, or alluding to a fact, you will correct it by your own recollection and judgment. I do not intend to express an opinion on the questions of fact, where the testimony is in conflict. I shall state to you the law which governs this case, and it is your duty to take the law from the court.

There are questions here that are new and have never been determined before, so far as I am aware. Some of them, as stated before, are difficult; some I may not be entirely clear about; but I have reached certain conclusions on the questions of law that have been so ably argued, and those I shall state to you so far as I deem them applicable to the case, and you will take them from the court and be governed accordingly. Whether wright or wrong, it is your duty to act on them as given by the court. If the court makes a mistake, or an error of law, it is known where that error lies. It can be re-examined by the court on a motion for a new

trial; or it can be taken to a higher tribunal, where the error will be corrected. But if you disregard the law as given to you by the court, and commit an error, it cannot be known on what error you acted. Therefore, there is no means of correcting your errors of law; but errors of fact may, perhaps, be corrected. You will, therefore, regard strictly the law as given you by the court, but you yourselves will determine the facts of the case.

Counsel on one side have presented a large number of instructions, and on the other side a less number. I have forty odd pages of instructions asked by one side. I shall not attempt to read these instructions. They are generally disconnected, and, even if correct, would serve rather to confuse than to illustrate. All, however, could not be given. I will state to counsel here that I shall only give such of their instructions as are covered by the general charge, and in my own language, as it will be delivered to the jury. In other respects, except as given in my own language, their instructions will be refused.

By an act of congress which took effect May 10, 1872, all valuable mineral deposits in lands belonging to the United States were declared to be free and open to exploration and purchase by citizens of the United States, and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as applicable and not inconsistent with the laws of the United States.

In order to acquire any right of location and purchase under this act, a party seeking to acquire such right must either be a citizen of the United States, or must have declared his intention to become such. If, therefore, Smith, or any other locator under whom plaintiff claims, was not a citizen, or had not declared his intention to become such at the time of making his location, he acquired no right, under the act, by virtue of such location. And whether Smith, or any other of such locators, was, at the time of his location, a citizen, or had declared his intention to become such, is a

question of fact for you to determine from the evidence. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, and none others, are citizens of the United States. A person born in a foreign country, out of the jurisdiction of the United States, whose father is not a citizen of the United States, can only become a citizen by naturalization. The foreign born son becomes a citizen by being himself naturalized, or by the naturalization of his father during the minority of the son. If, therefore, Smith was alien born, it was necessary that he should be naturalized, or that his father should be naturalized, during his minority, in order to make him a citizen. The statute, for the purpose of acquiring a mining location, makes the affidavit of the party himself competent evidence of his naturalization. It is for you to determine the sufficiency of the evidence to establish the fact.

All the locations under which plaintiff claims were made since May 10, 1872; and, at the time they were respectively made, the statute authorized a claim to be 1,500 feet in length along the vein or lode, and it was provided that "no claim shall extend more than 300 feet on each side of the middle of the vein at the surface; nor shall any claim be limited by any mining regulation to less than 25 feet on each side of the middle of the vein at the surface."

In the absence, then, of any mining rule or custom *in force* at the time of the location, at the place where it is made, the location may extend to the distance of 300 feet on each side of the middle of the vein at the surface; that is to say, the claim may be 1,500 feet in length along the vein, by 600 feet wide, including 300 feet on each side of the middle of the vein.

As I construe the statute, however, and so instruct you, by implication, the miners, by a rule, regulation, or custom established and *in force* at the time and place of the location, may limit the width of the claim to 25 feet on each side of the middle of the vein at the surface. But such limitation to 25 feet on each side, to be valid, must be by virtue of a rule, regulation, or custom which has not only been estab-

lished, but which is actually *in force* at the time of the location. The regulation must be in accordance, and not in conflict with, the laws of the United States and of the state of California; and the laws of California provide that, "in actions respecting mining claims, proof must be admitted of the customs, usages, or regulations established and *in force* at the bar or diggings embracing such claim; and such customs, usages, or regulations when not in conflict with the laws of this state, must govern the decision of the action." This provision is still in force, except so far as its operation is limited by the act of congress.

One of the locations under which plaintiff claims was made November 10, 1875, and the claim was relocated December 15, 1876, each time 300 feet wide on each side of the lode; the notice in terms purporting to locate it under the act of congress allowing such location.

It is claimed by the defendant that there was, at the time of the location and relocation, a regulation in force in that district limiting the claim to 50 feet on each side of the vein, and that the location of 300 feet is therefore void. Now, whether there was or not such a regulation or custom *in force* at the time is a question of fact to be found by the jury from all of the evidence in the case on that point.

The defendant, to show a regulation limiting the location to 50 feet on each side, introduced the minutes of proceeding of a miners' meeting in the district, held July 10, 1860, in which there is a rule making such limitation, and minutes of meetings held at various times subsequently, amending the rules, but continuing this rule in force down to and including November 13, 1867, at which time the last action in respect to modifying the rules and regulations was had till December 30, 1876, which is after said location and relocation, and nine years after any meeting amending said rules. At said meeting of December 30, 1876, the miners declined to adopt the "United States mining laws;" and no action upon the subject of rules is shown to have been since had by any miners' meeting.

The plaintiff, to meet this testimony, introduced the min-

ing records of the district, from which it appears that from and including the year 1872, when the act of congress referred to took effect, and thenceforth down to the year 1875, only one quartz location was made in the district, there being none in 1872, one in 1873, in which no width was specified, and none in the year 1874; that during the year 1875 eleven quartz locations were made, of which nine were made 300 feet wide on each side of the lode, and purported to have been made in pursuance of said act of congress, and two only of 50 feet wide on each side, one of which two was marked on the record as abandoned; and during the year 1876 twenty-five locations appear to have been made, of which five were 300 feet wide on each side of the vein, one an extension of a 600 feet claim having no width mentioned, and the others 50 feet wide on each side, four of which being after the relocation by Lockberg. From this it is argued by plaintiff that quartz mining in the district was practically abandoned for several years, and no laws on the subject were practically in force; that on the return of the miners, and the revival of mining in 1875, the act of congress had been passed, and the miners regarded that act as superseding the old laws on this point, and as authorizing the location of quartz claims 300 feet wide on each side, and in practice adopted and generally acquiesced in that rule—the rule limiting the claims to 50 feet, by common consent, falling into disuse and ceasing to be in force. As held by the supreme court of California, in commenting upon the provision of the state statute cited, "no distinction is made by the state statute between a 'custom' or 'usage,' the proof of which must rest in parol, and a 'regulation' which may be adopted by a miners' meeting and embodied in a written local law. This law does not, like a statute, acquire validity by the mere enactment, but from the customary obedience and acquiescence of the miners following its enactment. It is void whenever it falls into disuse, or is generally disregarded. It must not only be *established*, but in *force*.

"A custom reasonable in itself and generally observed will

v1,no.8—34

prevail as against a written mining law which has fallen into disuse. It is a question of fact for the jury whether the mining law is in force at any given time." It is for you, then, gentlemen of the jury, to determine whether this limitation to 50 feet was actually *in force* at the time the two locations 300 feet wide on each side were made. The fact that the rule in question was adopted and kept on foot in the laws for a considerable period of time would be *prima facie* evidence, nothing to the contrary appearing, that it was in force at one time, and, being once in force, a presumption would arise that it continued in force till something appears tending to show that it had been repealed, or had fallen into disuse and another practice been generally adopted and acquiesced in. The mere violation of a rule by a few persons only would not abrogate it, if still generally observed. The disregard and disuse must become so extensive as to show that in practice it has become generally disused. Now, gentlemen, whether, in view of there being few locations in this district during several years, and none in some, and of the passage of the act of congress referred to, and the location, at first, after the revival of the mining interest in 1875, of most all claims, in pursuance of the provisions of the act, 300 feet wide on each side, if such be the fact, and in view of all the circumstances appearing in the evidence, it is for you to determine whether the 50 feet limitation had fallen into disuse, or was really *in force* at the date of the two locations in question. If it was *not* in force, then, in that particular, if otherwise valid, the location was good and valid to the full extent of 300 feet on each side of the vein. If the limitation was in force, then it was void as to the excess over 50 feet on each side of the vein, but valid to the extent of 50 feet, and no more.

The statute also provides, gentlemen of the jury, that "no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located." So that no rights can be acquired under the statute by a location made before the discovery of a vein or lode within the limits of the claim located. A vein or lode authorized to be located is a seam or fissure in the earth's crust filled with quartz, or

with some other kind of rock, in place, carrying gold, silver, or other valuable mineral deposits named in the statute. It may be very thin, and it may be many feet thick, or thin in places—almost or quite pinched out, in miners' phrase—and in other places widening out into extensive bodies of ore. So, also, in places, it may be quite or nearly barren, and, at other places, immensely rich. It is only necessary to discover a genuine mineral vein or lode, whether small or large, rich or poor, at the point of discovery within the lines of the claim located, to entitle the miner to make a valid location including the vein or lode. It may, and often does, require much time and labor and great expense to develop a vein or lode after discovery and location sufficiently to determine whether there is a really valuable mine or not, and a location would be necessary before incurring such expense in developing the vein to secure to the miner the fruits of his labor and expense in case a rich mine should be developed. If, then, the locators of the East Noonday North, for example, discovered such a mineral vein or lode as I have described, however small, before the location of that claim, the location of the claim embracing within its lines the vein or lode so discovered was, in this particular, valid, otherwise not. The same observation would be true as to each of the other claims held by plaintiff.

I instruct you further, that if a party should make a location in all other respects regular, and in accordance with the laws, and the rules, regulations and customs in force at the place at the time, upon a supposed vein, before discovering the true vein or lode, and should do sufficient work to hold the claim, and after such location should discover the vein or lode within the limits of the claim located, before any other party had acquired any rights therein, from the date of his discovery his claim would be good to the limits of his claim, and the location valid. So, also, gentlemen of the jury, where a party has made a location of a mining claim upon a mineral vein or lode discovered by him, in all respects valid, he is entitled to "have the exclusive right of possession and enjoyment of all the surface included within the lines of

his location, and of all veins, lodes, and ledges, throughout their entire depth, the top or apex of which lies inside of such surface lines extended downwards vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downwards as to extend outside the vertical side lines of such surface location." That is to say, if the plaintiffs or their grantors discovered a mineral vein or lode in the North Noonday claim, and made and have now in all respects a valid location of that claim, then they are not only entitled to the particular vein or lode so discovered and located in said claim, but to all other minerals, veins, lodes, and ledges, throughout their entire depth, the top or apex of which lies inside of their surface lines extended vertically downwards, to which no right had attached in favor of other parties at the time their location became valid, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downwards as to extend outside the vertical side lines of the surface location. If the plaintiff has a valid claim to 600 feet wide, then its right extends to all such veins or lodes, under the conditions stated, so within the surface lines bounding the 600 feet drawn vertically downwards; and, if the vein in question is one of the veins having its top or apex within such surface lines drawn vertically downwards, its right extends to and includes that vein. If it has a valid claim to 100 feet wide, and only so much, then to such veins or lodes within the 100 feet lines.

The same principle and instruction applies to the Keystone and East Noonday North claims. If the plaintiff has a valid location to those claims, or either of them, then it is entitled to all the veins or lodes under similar circumstances, the apices or tops of which lie within the surface lines of such valid location, or locations, extended vertically downwards.

The next point to which I shall call your attention, gentlemen of the jury, is the location. To make a valid location, under the statute, it is required that "the *location* must be distinctly marked on the ground, so that *its boundaries can be readily traced;*" but the law does not define or prescribe what kind of marks shall be made, or upon what part of the ground

or claim they shall be placed.  Any marking on the ground claimed, by stakes and mounds and written notices, whereby the *boundaries* of the claim located *can be readily traced*, is sufficient.

If the center line of a location of a lode-claim lengthwise along the lode be marked by a prominent stake or monument at each end thereof, upon one or both of which is placed a written notice showing that the locator claims the length of said line upon the lode from stake to stake, and a certain specified number of feet in width on each side of said line, such location of the claim is so marked that the boundaries may be readily traced; and, so far as the marking of the location is concerned, is a sufficient compliance with the law.

If, therefore, as the testimony tends to show, the locator of the North Noonday mining claim planted a prominent stake at a shaft sunk in the earth on a vein, lode or ledge, upon the northern side of which was placed a notice, stating that he claimed 1,500 feet on "this the Noonday Quartz Lode," including all the dips, spurs, angles and feeders, together with 300 feet on each side; that said claim begins at a point in the center of a small shaft about one-fourth of a mile northerly from Queen Bee Hill, and extends thence in a northerly direction 1,500 feet to a post and mound upon which is inscribed "Noonday Quartz Lode, Charles Smith's Northern Boundary," and erects such mound and stake at said northern boundary, and marks said inscription thereon, the location is distinctly marked on the ground, so that its boundaries can be readily traced within the meaning of the act, and is a compliance with the law in that particular.  The same principle is equally applicable to the Keystone location, and to that of the East Noonday North.

There is testimony tending to show that the rule and custom of miners in Bodie district, at the time the several locations under which plaintiff claims were made, required mining claims to be recorded.  If you find such to have been the rule or custom in force at the time, then a record was necessary, otherwise not.

In order to make a valid record, it was necessary for it to

contain the name, or names, of the locator or locators; the date of the location, and such a description of the claim, or claims, located, by reference to some natural or permanent monument, as would identify the claim.

The natural objects or permanent monuments here referred to are not required to be on the ground located, although they may be; and the natural object may consist of any fixed natural object; and such permanent monument may consist of a prominent post or stake firmly planted in the ground, or of a shaft sunk in the ground. The record of each location of the North Noonday, Keystone, and East-Noonday North, introduced by plaintiff in evidence, contained the names of the locators, the date of their location, and a description of the claim located, by reference both to a *shaft* and to stakes planted in the ground having notices of the location thereon.

If you are satisfied, from the evidence, that these records were in fact made, (and there is no evidence to the contrary,) and that the descriptions of the several claims located therein contained, by reference to the natural and permanent monuments mentioned, were such as would identify the claims with reasonable certainty, then you will find the records sufficient and valid in this particular, otherwise insufficient.

As there has been much comment upon the record of the East Noonday North location, I think it proper to call your attention more particularly to it.

The record appears to be a copy of the notice placed on the claim, and would, doubtless, so be understood by a miner reading it for information. A person reading the record would be informed by it that the owners of the Noonday claim were the claimants, and that the claim was named the East Noonday North, probably, with reference to the Noonday claim; that it was located on Silver Hill, a natural, well-known object; that the claim commenced at a stake with a notice on it, of which the record is a copy, placed east of the Noonday shaft, which is a permanent object, having, as the testimony tends to show, already existed eight or ten years,

and extended in a northerly direction from the stake 1,500 feet by 50 feet on each side.

There was, then, in the record, a description of the location with reference to Silver Hill, a natural object, and the Noonday shaft, a permanent object, and it is for the jury to determine whether a miner, seeking information from this record, could go to the permanent object, the Noonday shaft on Silver Hill, and thence east, and find the stake and notice pointing out the location on the ground with reasonable certainty. If so, the jury will be justified in finding that there is such a description of the claim in the record, with reference to some natural or permanent object, as to identify it, and that the location is valid in this particular. It was not necessary for the claimants to finally mark the location on the ground till after the record was made, and the testimony tends to show that the location was not fully completed till the next day after the record was made, when the locators planted this stake with the notice on the south line of the claim, and of the North Noonday claim 100 feet east of the Noonday shaft, with another at the northerly end, and that this became the final location on the ground, and which, the testimony tends to show, was ever after claimed, and subsequently surveyed, and stakes placed at the corners.

If the jury find that the location was at that time actually marked upon the ground by stakes and notices, so that its boundaries could be readily traced in the manner I before instructed you, was sufficient with reference to the North Noonday claim, then the location was sufficient in this particular also.

The testimony also tends to show that, prior to any rights being acquired by the defendant, plaintiff's grantors, in addition to the lode line stakes set up at the location of their several claims, planted other stakes and monuments at the various corners of their claims, thus forming a parallelogram 1,500 feet long by 300 feet wide, including the Keystone, East Noonday North, and a portion of the original North Noonday claims, with a line of five stakes on each end of the parallelogram; and that they and the plaintiff renewed these

stakes from time to time, as they were removed, until the work was commenced at the combination shaft, which has ever since been continuous to the present time; and it is claimed that if there was at the time of the location any defect in the marking on the ground, this additional marking, before any rights were acquired by the defendant, was clearly sufficient to validate these claims. In regard to this point, I instruct you, gentlemen, that a subsequent locator cannot object that a prior location of a mining claim was not sufficiently marked on the ground at the time of its location, provided such prior location was sufficiently marked on the ground before such subsequent locator made any location or acquired any rights in such claim.

The testimony tends to show, and there is none to the contrary, that Smith did no work on the North Noonday within the year after he located it, in 1875, and supposing he had forfeited his claim he procured Lockberg to relocate it for him, and convey it, on December 16, 1876; that Lockberg did so relocate it on that day and immediately conveyed it to Smith, who then, either alone, or in connection with others interested with him, entered upon the claim and did sufficient work during the year to hold it for that year; and that Smith paid the recording fees, $15.

If these be the facts, and no other rights had in the meantime attached—and there is no evidence that any had attached—then, if the location made by Lockberg was otherwise sufficient and legal, and Lockberg and Smith were American citizens, Smith, by the several proceedings, had acquired a valid right to the claim.

The statute requires $100 in value of work to be done on each claim located after May 10, 1872, in each year, in order to hold it; and, in default of such work being done, authorizes the claim to be relocated by other parties, provided the first locator has not resumed work upon it. But if the first locator resumes work at any time after the expiration of the year, before other rights attach in favor of relocators, he preserves his claim.

The statute nowhere authorizes a person to trespass upon

or to relocate a claim, before properly located by another, however derelict in performing the required work the first locator may have been, provided he has returned and resumed work, and is actually engaged in developing his claim at the time the second locator enters and attempts to secure the claim.

It is urged by defendant that Smith was not a citizen, and, therefore, that he could acquire no right by location. In view of this claim, and in case you find from the evidence this to be the fact, I give you this further instruction:

The testimony shows that Smith, at various times, before defendant acquired any interest, conveyed portions of whatever right he had to other parties next hereinafter named, and finally, on September 28, 1878, conveyed all his remaining interest in all of the claims, by specific description, to said parties, Irwin, John and James Welch and Patrick Clancy, in whom, whatever interest had before been acquired by virtue of said several locations, at this time had become vested.

If Smith, even though not a citizen, performed all the acts necessary to make a valid location, and did the work necessary to keep his claim good, had he been a citizen, until he conveyed to Irwin and others, and if Irwin and his co-grantees were citizens, and after the conveyance to them took possession and control, and kept up the monuments and markings, and performed the necessary conditions to keep the claims good, then they acquired a good and valid right to the claim, as against defendant, from the date of the conveyance to them, provided that no other rights had attached in defendant's favor prior to such conveyance to them, and such subsequent performance of said required conditions by them.

The East Noonday North claim was located by Welch, Smith and Irwin November 27, 1877, before any rights had been acquired by the Orient Company, defendant. The claim contains no more than one man was authorized to locate. So that, if one or more of the locators were citizens, in that particular the location of the claim was good as to such citizen or citizens, even though one or more of the others were aliens and not entitled to locate. If, therefore, one or more of these loca-

tors were citizens, and the claim was in other particulars well located, and the proper conditions performed to hold the claim till the subsequent conveyance to plaintiff, November 20, 1878, a good title thereto, as against defendant, passed to the North Noonday Company, plaintiff, by that conveyance.

The North Noonday Mining Company, plaintiff, is a corporation, created and existing under the laws of California, and is, therefore, to be deemed a citizen within the meaning of the statute, and as such is competent to purchase and hold a mining claim. Irwin, the Welches, and Clancy, as locators of the East Noonday North and grantees of Smith of the other claims and of his interest in the East Noonday North, held all the interest in all said claims acquired by the various proceedings in question, and so holding such interest on November 20, 1878, conveyed all their interest in all said claims to the North Noonday Mining Company, plaintiff, which thereby became vested with all the interest that could be acquired by virtue of said transactions. If, therefore, the grantors of plaintiff had performed all the acts necessary for a citizen to perform in order to locate and hold said several claims down to the date of said conveyance, and the said plaintiff took possession and control of said several claims upon receiving said conveyance, and thereafter kept the said claims properly marked on the ground and performed all the conditions necessary to maintain their said claims, then said plaintiff acquired a good title to such of said claims as were so properly in form located and kept up as against said Orient Mining Company, defendant, provided said defendant acquired no rights in said claims, or any of them, prior to the acquisition of said interest by said plaintiff through said conveyance, and such subsequent acts of said plaintiff to preserve their rights to said claims, even though one or more of said original locators should be found not to have been citizens, and, on that ground, incompetent to acquire any title under said act of congress.

The testimony tends to show various work done on the several claims by the claimants Welch, Smith and others, during 1877 and 1878, claimed by plaintiff to be sufficient to hold

the claims; that Welch, in August, 1878, placed a line of mounds and stakes on each end of the several claims 50 feet apart, for a distance of some 300 feet, by way of indicating the corners and end lines; that Anderson, on October 19, 1878, measured off the claims and again set stakes according to the proper measurements; that these stakes being four inches square, three and one-half feet high, painted white, and marked so as to indicate the corners and lode line of the said claims, were found there by Scowden when he finally surveyed the claims in the following spring and located the shaft.

The testimony further tends to show, and, as to this part of the testimony, I believe there is none to the contrary—if there is any you will remember it—that the interest in all the three claims having been concentrated in the plaintiff, the North Noonday Mining Company, in the preceding November, the plaintiff, in March, 1879, before any other parties had entered upon these claims, or made any claim thereto, located and made arrangements to sink a three-compartment shaft, known as the combination shaft, for the benefit and to be used for the development of all the claims, and also the Noonday claim to the south; that machinery and supplies were at once collected and brought upon the ground for the purpose of sinking said shaft, and developing and jointly working all said claims; that from that time on the plaintiff, by its agents and servants, was actually on the ground erecting machinery and buildings, exercising acts of ownership and dominion over the claims, claiming title to the whole; that the plaintiff commenced sinking the combination shaft on or about April 5, 1879, and from that time to the present has been, by its agents and servants, actually on the ground, constantly and vigorously prosecuting the work of developing and working the mines claimed by them, and constantly exercising dominion over them; that by June 1st buildings and machinery had been erected and brought upon the ground and supplies collected to the amount of more than $30,000.

If you find these to be the facts, gentlemen of the jury, then there was not at this time merely a constructive possession of these mining claims by virtue of the mining laws alone,

but an actual occupation and possession, **a** *possessio pedis,* **a** physical presence of the plaintiff by its officers, agents and servants, actually controlling and dominating the claims as early, at least, as the month of March or April, and the domination and possession extended to the bounds of the claims as described in the conveyance to plaintiff, under which it claimed title, and as indicated by the stakes planted by Anderson and found by Scowden to mark the location, and the notices stating the extent of the claims—the claims lying, the testimony tends to show, in one body, and conveyed by one deed to the same party, and being developed by the same means as a part of one general system. If, therefore, you find from the evidence that the plaintiff acquired and maintained a valid location to all or any of these claims in question by the means in these instructions before indicated, and performed the acts of possession just supposed, before any right had accrued to the defendant, then, as to such claim or claims, the plaintiff had, as against the defendant, both a good title and rightful possession at the time the trespasses are alleged to have been committed, and when it is conceded that the defendant actually entered and committed the acts complained of, and you will find for the plaintiff on those points.

If you find title and rightful possession in the plaintiff, as just indicated, as to all or any of said mining claims, you will then inquire whether the vein or lode in question which the defendant cut in the head of the winze at the end of its cross-cut, called by defendant Orient Lode No. 3, is one of the veins or lodes discovered in any of the claims, the right, title, and possession to which you find to be in the plaintiff as against defendant; and if you find that is one of such veins or lodes, or if you find that it is not one of those lodes, but that it has its apex or top within the side lines of any such claim, the title and possession to which you so find to be in the plaintiff, drawn vertically downwards, then, in either case, it belongs to the plaintiff, and your verdict will be for the plaintiff. But if you find that said vein or lode so cut by defendant is not one of the veins or lodes discovered within any claim, the title to which you find in the plaintiff,

and that its apex or top is not within the side lines of any such claim of plaintiff drawn vertically downwards, but is a separate, independent vein, every part of which lies to the eastward, or outside of and beyond any claim, the title to which you find to be in plaintiff, and no part of the apex or top of which is within the side lines of such claim drawn vertically downwards, then it does not belong to plaintiff and your verdict will be for defendant.

If you find for the plaintiff, gentlemen, you will then inquire what the damages are. The testimony on the question of damages is that about 55 tons of ore have been taken out, and I think the testimony is that it is about $25 or $30 per ton in value. The damages will be the value of the quartz removed; at all events, if you cannot agree on the damages, they are entitled to nominal damages, say one dollar.

If you find for the plaintiff, your verdict will be—

"We, the jury, find for the plaintiff, and assess the damages at so many dollars."

If, on the other hand, you find for the defendant, your your verdict will be—

"We, the jury, find for the defendant."

The verdict of the jury was for the plaintiff, with one dollar damages.