[Sac. No. 1024. In Bank.—September 28, 1904.]

## G. W. DWINNELL, Respondent, v. W. F. DYER et al., Appellants.

MINING CLAIM—LOCATION—EFFECT OF STATE LAW—VALID LOCAL RULES.
—The state law of March 27, 1897, respecting the contents of location notices, and the record thereof within limited periods, was valid as being a local regulation authorized by the act of Congress, and so long as it was unrepealed was obligatory upon locators of mining claims in this state. But if the Revised Statutes were otherwise complied with, a compliance with the state law might be had at any time while the statute was in force, if there were no intervening rights.

ID.—VOID TECHNICAL LOCATION.—A mere technical location of a mining claim during the existence of the state law, without compliance therewith, and without any attempt to work or develop the claim, in compliance with the Revised Statutes, is wholly invalid, and a deed thereof conveys no title.

ID.—EFFECT OF REPEAL UPON LOCATION OTHERWISE VALID—ACTUAL POSSESSION TO BOUNDARIES—SUBSEQUENT LOCATION.—The repeal of the state law had the effect thereafter to dispense with its requirements, and work thereafter done under a prior location otherwise valid, and properly maintained under the Revised Statutes, had reference to the boundaries marked in accordance therewith, and constituted actual possession of the claim to the extent of those boundaries, which precluded a valid conflict therewith under a subsequent location.

ID.—ACTION TO QUIET TITLE—FINDINGS AGAINST EVIDENCE—INCONSISTENCY—DECISION AGAINST LAW.—Where the defendants in an action to quiet title claimed under a location of mining ground made while the state law was in force, but which was perfected by actual possession and work under the Revised Statutes after repeal of the state law, and plaintiff claimed under a subsequent location, *held,* that findings that the mining ground possessed by the defendants was public mineral land of the United States when plaintiff made his location, and that his location conflicting with defendants' claim was valid, are against the evidence, inconsistent with other specific findings and with certain averments of the complaint, and also that the decision is against law, in failing to find upon the material issue whether defendants' location was not perfected as a good claim prior to plaintiff's location.

ID.—CASE DISTINGUISHED.—The case of *Belk* v. *Meagher,* 104 U. S. 270, distinguished, and held not to be controlling authority in support of the decision in favor of plaintiff's location.

APPEAL from a judgment of the Superior Court of Siskiyou County and from an order denying a new trial. J. S. Beard, Judge.

The facts are stated in the opinion of the court.

Gillis & Tapscott, for Appellants.

R. S. Taylor, for Respondent.

BEATTY, C. J.—Action to quiet title to a mining claim. In his complaint, filed November 30, 1900, the plaintiff alleged among other things that he was, and for a long time had been, the owner, entitled to the possession, and in the exclusive possession, of a quartz-lode mining claim, known as the Cuban Beauty No. 2; that on the 15th of November, 1900, the defendants had entered upon the claim with force and arms and had driven off the men employed by him to do the necessary assessment-work for that year; that they had taken possession of the ground, claimed to own it, and were excavating and removing the gold-bearing quartz, etc. Wherefore he prayed for a temporary injunction and for a final decree adjudging him to be the owner, etc. By their answer the defendants alleged that W. F. Dyer was the owner of a mining claim located in 1898 as the Squaw Creek No. 2, a small portion of which was included within the alleged boundaries of Cuban Beauty No. 2, and they denied that they had excluded plaintiff from any portion of his claim except that which overlapped the superior claim of W. F. Dyer. As to that portion, they admitted in effect that they were holding it and mining and removing the ores contained therein. From this brief statement it will sufficiently appear that the only material issues presented by the pleadings were those relating to the validity and priority of the overlapping claims. Upon these issues the findings and decision of the superior court were in favor of the plaintiff, and the defendants appeal from the judgment and from an order denying them a new trial.

From the evidence contained in the record it appears that both parties relied, to some extent at least, upon locations made or attempted in 1898, all of which were held invalid for failure of the locators to comply with some of the requirements of an act of the legislature of California, passed March 27,

1897, prescribing the manner of making mining locations, etc. (Stats. 1897, p. 214.) These locations being held void, the decision of the superior court in favor of the plaintiff was based wholly upon a relocation of the Cuban Beauty No. 2, made November 26, 1900, by the plaintiff, just four days before he commenced this action.

In view of the grounds of the motion for a new trial,—i. e. failure of the evidence to sustain the findings, and that the decision is against law,—it will facilitate the discussion to quote some of the more specific findings in full. They are as follows:—

"I.

"That upon the 26th day of November, 1900, plaintiff, a citizen of the United States over the age of twenty-one years, located as a mining claim a certain parcel of land situated in Gazelle Mining District, county of Siskiyou, state of California, and described as commencing at a point where location notice was posted, thence westerly along the line of the Cuban Beauty Quartz Mine a distance of 300 feet to stake in mound of rock; then southerly a distance of 1500 feet to stake in mound of rock; thence easterly 600 feet to a stake in mound of rock; thence in a northerly direction 1500 feet to the southeast corner of the Cuban Beauty Quartz Mine, to stake in mound of rock; thence along the line of said Cuban Beauty Quartz Mine to place of beginning, and commonly known as the Cuban Beauty No. 2.

"That at the time plaintiff made mining location, said land was unoccupied public mineral land of the United States, and subject to location as such.

"II.

"That in making said location plaintiff complied with the laws of the United States by placing markings at the exterior boundaries of said location so that the same could be readily traced, and also complied with all local custom and usages in recording notice of said location.

"III.

"That prior to said location by plaintiff one Grant Davis had attempted to locate the same land covered by the said location of plaintiff herein, and thereafter sold and conveyed said land to this plaintiff by deed.

## "IV.

"That prior to said location by plaintiff, defendant W. F. Dyer and Frank Phillips had attempted to make locations of certain quartz mining ground in Gazelle Mining District, and known as Squaw Creek Gold Mine No. 1, Squaw Creek Gold Mine No. 2, and Squaw Creek Gold Mine No. 3. That said Squaw Creek Gold Mine No. 2 covers a portion of the same ground covered by the location of the plaintiff herein.

## "V.

"That the said attempted locations made by said Grant Davis and by said defendant W. F. Dyer and said Frank Phillips were not made in compliance with the law then in force when the same was made.

## "VI.

"That upon or about the 15th day of November, 1900, plaintiff sent workmen upon said claim for the purpose of doing assessment work thereon, and upon said day defendants wrongfully and with force and arms, entered upon said land of plaintiff and drove off said workmen and threatened to drive them off if they ever returned, and at the time of the commencement of this action still hold possession thereof, and threaten to continue to hold possession."

These findings, when read in connection with the evidence in the case, fully disclose the erroneous view of the law which guided the decision of the superior court. The attempted location of the Squaw Creek claims by Dyer and Phillips was in September, 1898, and the evidence shows without substantial conflict that they then did everything necessary to constitute a valid location of the ground under the laws of the United States; that is to say, they discovered a lode of gold-bearing quartz, they posted on the ground a notice claiming fifteen hundred feet along the supposed course of the vein and three hundred feet on either side, they plainly marked the exterior lines of their claim, including the point of discovery, and shortly afterwards commenced the work of development, which they prosecuted with more than sufficient diligence. In addition to this Dyer, who had acquired the interest of his co-locator, Phillips, built a house on the claim and was residing there within his marked boundaries at the time when plaintiff's employees came on the ground, November 15, 1900, for

the purpose of doing assessment-work for the Grant Davis location of Cuban Beauty No. 2, and also when plaintiff made the location on November 26, 1900, which the court finds to have been a valid location of unoccupied mining ground, and upon which alone his right of recovery is made to depend. The attempted location of the Cuban Beauty No. 2 by Grant Davis was made in October, 1898, a month later than the discovery and attempted location of the lode by Dyer, and the acts done by Davis—giving the utmost credit to his testimony—fell far short of the efforts of Dyer to comply with the law. His evidence leaves it very doubtful if he ever discovered any gold-bearing rock in place or did anything except to mark the boundaries of his claim. The court finds that his claim as marked was the same as the location made by plaintiff November 26, 1900, and there is evidence that this claim at its extreme southern end includes some croppings of a lode, which appears to be the same as that upon which Dyer has done a large amount of work. But this finding that plaintiff's location embraces the identical ground covered by the Grant Davis claim is sustained by no testimony aside from that of Davis, and his testimony on the stand is in direct conflict with statements he admits having made when on the ground with Dyer and others for the purpose of adjusting their lines so as to avoid a conflict of locations. At that time he stated that his southwest corner was where he now claims his southeast corner was placed, and the change he thus makes involves a swinging of the southern end of his claim six hundred feet to the west, making it by that means alone cover a triangular portion of Dyer's claim, including the only rock in place which could have been the basis of a valid location. He, however, says that his statement on the ground was a mistake, and the trial judge accepted his explanation, as he had a right to do, and as we should perhaps be bound to do if the fact were material, which, as will appear, we do not deem it to be so far as the present appeal is concerned. In view, however, of the necessity for a new trial, and the possible materiality of this fact in some different aspect of the case, it may properly be suggested that an accurate instrumental survey of this original claim in connection with the lines of the older claims— the Cuban Beauty and Dewey, with reference to which the Cuban Beauty No. 2 was located, and the subsequently located

claims of Chadwick and the Black Bear No. 2, located with reference to the Cuban Beauty, the Dewey, and Cuban Beauty No. 2—would probably show whether the testimony of Grant Davis, in addition to being inconsistent with his former statements, does not also involve a geometric absurdity; that is to say, whether it does not require us to believe that by going south on the west side of a claim bounded by parallel lines we will reach the southeast instead of the southwest corner. But assuming for the present purpose that the plaintiff's location of November 26, 1900, covered the identical ground included by the boundaries marked by Grant Davis in October, 1898, there is no evidence that either Davis or the plaintiff ever did, or attempted to do, any development work within those boundaries prior to the 15th of November, 1900, when plaintiff's men found Dyer in possession and were driven off the ground by him and his employees, Dyer having in the mean time, as above stated, built a cabin on the ground, taken up his residence there, and continued work upon the vein. But the whole question as to what, if any, effect the Grant Davis location may have had upon the rights of the parties is eliminated from the case as presented on this appeal by the finding of the court—amply sustained by the evidence, even if the respondent could question it—that his attempted location was invalid for want of conformity to the requirements of the law then in force.

The law to which this finding (No. V) refers was the above-cited act of March 27, 1897, prescribing certain particulars that location notices must contain, and requiring the record of such notices within certain limited periods. This state law was no doubt valid as one of the local regulations authorized and sanctioned by the act of Congress, and so long as it remained unrepealed was obligatory upon those who desired to secure mining claims in this state by the constructive possession resulting from a technical compliance with the law. The superior court, therefore, was right in concluding that neither the Davis location nor the Dyer location was valid at the time it was made. But the act of 1897 was repealed long before the plaintiff made his location in November, 1900. In the first place, an act properly entitled was passed March 20, 1899, (Stats. 1899, p. 148,) for the purpose of repealing it, but owing to a faulty wording of the body of

the act there seems to have been a question whether it effected the desired repeal. In consequence of this uncertainty the same act properly worded was introduced at the extra session of the legislature in 1900, and finally passed February 8th of that year, taking immediate effect. (Stats. 1900, p. 9.) The result of this repeal was to make the validity of mining locations in this state solely dependent from that time forward upon a compliance with the laws of the United States and such valid local regulations as the miners themselves may have adopted in their respective districts. There is no evidence of an organized district including these claims, and no suggestion of a failure to comply with any miners' rules or customs. So that the point to be considered is the effect upon the Davis and Dyer locations of the entire elimination from our state or local laws of all regulations additional or supplemental to the laws of the United States governing the location of mining claims. The repeal of the state law took effect at least as early as February 8, 1900, if not on the 20th of March, 1899, and the condition in which it found the Davis and Dyer claims was this: Davis had never attempted anything except a technical location, and in that he had failed. Dyer had also failed in his earlier attempt at a technical location, but he was on the ground working the vein within his marked boundaries, and had done everything necessary to constitute a valid location under the only law then and thereafter in force. This being so, his claim was thenceforward good so long as he continued to do the necessary assessment-work. This work, and far more than necessary to satisfy the requirements of the act of Congress, was clearly proved without any substantial conflict in the evidence, and therefore the concluding portion of the first finding, to the effect that on November 26, 1900, plaintiff's mining location was made upon *unoccupied* mineral land of the United States, is unsustained by the evidence. This finding is apparently based upon the view that the Dyer location having been originally defective by reason solely of non-compliance with the state law—although fully complying with the laws of the United States—acquired no validity by the repeal of the state law. But this is not a correct view. The repeal of the state law of course had no *affirmative* effect in giving validity to the location, but it did away forever with the necessity of conforming to its provisions and left unim-

paired and unaffected every right which is conferred by a
compliance with the provisions of the Revised Statutes of the
United States. Dyer, having complied with those provisions,
was certainly in no worse a situation with respect to this
ground than the plaintiff. He had discovered the ledge once,
—he could not discover it again. He had marked the bound-
aries of his claim,—there was nothing to be gained by mark-
ing again boundaries that were already marked. The laws
of the United States require no posting or recording of notices,
but merely provide that a notice when required by local regu-
lations must contain certain things in order to be of any ef-
fect. There was no longer any law providing for notice or
record or giving any effect to a recorded notice, and all that
Dyer could do was to perform the amount of development-
work required by the law of Congress, and that he was doing
when this action was commenced and injunction issued more
than a month prior to the expiration of the year allowed to
him for that purpose. Upon these facts we cannot under-
stand how it could be held that at the time of plaintiff's at-
tempted location the ground was unoccupied. Dyer had in
fact a *pedis possessio* to the extent of his visible boundaries,
and the fact that those boundaries had been marked in con-
nection with an attempted location invalid only because of
failure to comply in other particulars with the state statute
of 1897—then no longer in force—made them none the less
efficacious for his protection. (*Conway* v. *Hart,* 129 Cal.
483, 484.) The working of a quartz lode inside of defined
boundaries is not only a *pedis possessio* of all the ground
within such boundaries, but is in itself the substance of every-
thing required by law to constitute a valid location, and ever
since the decision of this court in *English* v. *Johnson,* 17 Cal.
107,[1] it has been held to give a good title to a mining claim
(not excessive in extent) regardless of local rules providing
for the posting and recording of notices. It is actual pos-
session, while a formal location is only constructive possession.
In addition to the cases of *English* v. *Johnson* and *Conway* v.
*Hart,* above cited from the decisions of this court, we refer
for a fuller statement and elucidation of the views here ex-
pressed as to the location of mining claims since the act of
Congress of May 10, 1872, to the following cases: *Golden*

[1] 76 Am. Dec. 574.

*Fleece Co.* v. *Cable Consolidated Co.,* 12 Nev. 312; *Gleeson* v. *Martin White Co.,* 13 Nev. 442; *North Noonday Co.* v. *Orient Co.,* 1 Fed. 522; *Jupiter Co.* v. *Bodie Mining Co.,* 11 Fed. 666.

The Nevada cases were among the first that arose under the act of Congress of May, 1872, and the views therein expressed were substantially embodied in the charge to the jury given by Judge Sawyer in the two cases cited from the Federal Reporter. The decisions of Judge Sawyer have been cited and followed in numerous subsequent cases in the federal and state courts, and we are not aware that they have ever been seriously questioned.

It is proper here to notice the case of *Belk* v. *Meagher,* 104 U. S. 279, which in the Department opinion affirming the judgment and order of the superior court was cited as a controlling authority. It will not be difficult, we think, to point out a distinction between that case and this, which makes it totally inapplicable to the point to be decided here. In that case, Belk, in December, 1876, posted a notice of location upon mining ground then covered by a valid claim of third parties who by their acts done in compliance with the law of the United States had become invested, according to its express terms, with the "exclusive right of possession" of the ground so located until the first of January, 1877. If by that date they did not resume work on the claim their right of possession would lapse, but in the mean time it was unquestionable, and when Belk attempted his location he not only posted his notice upon ground not open to location, but he was guilty of an unlawful act—a trespass upon the lawful possession of others. A careful reading of Chief Justice Waite's opinion will show that for this reason alone his acts done in December were held utterly void. In this case the acts of Dyer done while the act of 1897 was in force were every one of them lawful, and every one of them constituted a step taken in compliance with the law of Congress. His discovery was upon unoccupied land of the United States, his entry, his marking of boundaries, his work on the lode— everything he did—was free from any imputation of illegality, and when he had fully complied with the act of Congress there was nothing left for him to do except to post and record the notices as prescribed by the state law in order to

make his location perfect, and this he could have done at any time before the ground became subject to an intervening right.  Under the law of Congress, under the law of this state, and under every code of district laws adopted by miners that has come to my notice, the prescribed order of the acts necessary to a valid location is, first, the discovery of mineral-bearing rock in place; second, the posting of notice at or near the point where the ledge is exposed; next, the recording of notice; next, the marking of boundaries; and finally the work of development.  But although this is the proper and natural order of procedure it is not obligatory in the absence of intervening rights.  It is indeed universally held that when every act necessary to complete a location has been done before an adverse claim has accrued, the order in which such acts have been performed is immaterial.  If, for instance, a locator, before the discovery of any lode, begins by first marking out a surface claim, his location is perfected if he develops a lode within his boundaries, before a good location is made by an adverse claimant.  So here, Dyer having done everything required by the act of Congress, could have perfected his claim under the state law, if it had remained in force, by a subsequent posting and recording of the prescribed notices.

To state the matter in another form: Several distinct acts are essential to constitute a valid location; the order in which they are performed is immaterial.  Dyer performed all the acts required by the federal statute in a perfectly legal manner, and they were all valid—the acts to be performed under the state law had been omitted, but were still performable at his option without any infringement of intervening claims when the state released him in common with all others from compliance with its local law.  His claim was then perfect. Belk, on the contrary, commenced his attempted location by an unlawful trespass upon the rights of others, which for that reason was totally invalid as the foundation of any right, and, excluding this unlawful act from consideration, it was held that his subsequent acts prior to Meagher's location were insufficient to secure the ground.  Dyer's acts, on the contrary,—none of which could be excluded from consideration on the ground of illegality,—did long prior to the 26th of November, 1900, constitute a perfect location as the law stood from and after the 6th of February of that year.

.We have not overlooked the contention of respondent that it is found as a fact by the superior court (concluding portion of the first finding) that when plaintiff made his location on November 26, 1900, the ground was vacant and unoccupied, and his further contention that there is sufficient conflict and uncertainty in the evidence regarding the Dyer locations to sustain this finding in its broadest sense. We think, however, that such a finding would not only have been in conflict with all the substantial evidence in the case, but it would have been inconsistent with other and more specific findings and with the allegations of the complaint.

The allegation of the complaint is, that the ouster by defendants occurred on the 15th of November, 1900, and the evidence conforms strictly to this allegation. It shows that on that day two men employed by plaintiff to do assessment-work on his supposed claim were driven from the ground by Dyer and his men. At that date, then, when, according to the specific findings of the court, plaintiff had acquired no rights to any of the ground in controversy, the defendants were on the ground and remained in possession, claiming it under the location which the court finds they had long before *attempted* to make. It was eleven days later that the plaintiff's supposed right was initiated by his formal location of November 26th, and when four days later, on November 30th, he filed his complaint in this action, he alleged the ouster on the 15th, the taking possession and claim of ownership by defendants, and that they were excavating and threatening to continue excavating the gold-bearing rock. In short, the allegations of the complaint itself, on any fair construction of their terms, are inconsistent with the assumption that Dyer was not in possession of his claim at the date of plaintiff's location.

Finally, we think that a new trial should have been granted upon the ground that the decision is against law for want of a finding upon the most material issue presented by the pleadings. It is found that plaintiff made a location of the ground in November, 1900, and it is found that Dyer's previous location was invalid for lack of conformity to a law in force at the time it was made. This finding, however, is entirely consistent, as we have endeavored to show, with the supposition that after the repeal of the act of 1897 his location may have

been or become perfect, and the material question—the issue upon which the whole case depends—is not whether Dyer had a good claim in 1898 or 1899, but whether he had a good claim prior to November 26, 1900. Upon this point there is no direct finding, and if it be contended that it is indirectly or inferentially found against the defendant, we can only repeat that such finding is not only in conflict with the evidence, but inconsistent with the allegations of the complaint.

The judgment and order appealed from are reversed.

Shaw, J., Van Dyke, J., Lorigan, J., and Henshaw, J., concurred.

McFARLAND, J.—I dissent, and adhere to the opinion heretofore rendered in Department. I think that the judgment and order appealed from should be affirmed.

The following is the opinion rendered in Department Two on the 28th of April, 1904, adhered to in the dissenting opinion of Mr. Justice McFarland:—

CHIPMAN, C.—Plaintiff alleges ownership of a quartz mine called Cuban Beauty No. 2, situated in Siskiyou County; that defendants unlawfully entered upon plaintiff's said land with force and arms and drove. off plaintiff's men there employed, and are excavating gold-bearing rock contained therein. It is prayed that defendants be enjoined from interfering with said mining property, and that plaintiff be adjudged to be the owner thereof.

Defendants Oscar Dyer and Charles Truesdale disclaimed all interest in the land in controversy. Defendant W. F. Dyer answered claiming ownership in certain three mining claims known as Squaw Creek Gold Mine No. 1 and No. 2 and No. 3. It is alleged that a portion of plaintiff's said claim overlaps a portion of Squaw Creek Gold Mines Nos. 2 and 3; ownership is claimed at the commencement of the action and some time prior thereto, and that defendant and his predecessor in interest have been in possession continuously since September 12, 1898, and since said date have been entitled to possession; denies plaintiff's ownership of any part of said overlapping ground; denies interference with plaintiff or claim of his said alleged claim, except as to said triangular piece.

The court found the facts for the plaintiff, and as conclusions of law found that plaintiff is the owner and entitled to have defendant restrained from interfering therewith. Judgment was accordingly entered, from which and from the order denying his motion for a new trial defendant appeals.

Certain errors of law occurring at the trial are specified by defendant, but as they are not noticed in his brief they will be deemed waived. Appellant's contention is, that the evidence does not sustain the findings in certain particulars, namely: 1. That at the time plaintiff made his location, November 26, 1900, the ground was unoccupied and subject to location, the contention of defendant being that he had long prior to that date made a valid location of ground including that in dispute; 2. Under like contention the finding is claimed as unsupported that plaintiff complied with law; 3. Also as unsupported, that one Grant Davis had attempted to locate the same land as that covered by plaintiff's location, and thereafter sold and conveyed the same to plaintiff, and this because the Davis location was in conflict with a prior location by defendant; that the Davis location did not include any ledge in place; that Davis had made no discovery of mineral in place within the lines of his location; 4. Also as unsupported, so far as concerns defendant, that the attempted early locations of Davis and of defendants Dyer and Phillips were not made in compliance with the law then in force—to wit, the act of March 27, 1897, of this state—defendant's contention being that his location was valid.

There is evidence that Davis made his location October 30, 1898, on which day he posted notice at the center of the north line of the claim bordering on the so-called Cuban Beauty. The lines were run out and corners marked. The notice was not recorded until September 8, 1899. The Cuban Beauty and the Dewey, both of which corner with the Cuban Beauty No. 2 at the northeast corner of the latter, were located at the same time by the Davis party and formed one group of mines. Davis subsequently also located the Black Bear No. 2, which lies south of and adjoining the Cuban Beauty and west of the Cuban Beauty No. 2, and joins it, but extends south less than half the length of the latter. He conveyed to plaintiff on November 27, 1899, by deed placed in escrow, which was delivered on compliance with the contract of sale in September,

1900. There is evidence, though not without conflict, that when these locations were made there was no other location or signs of any other location of the ground involved. On November 26, 1900, plaintiff relocated the Cuban Beauty No. 2 through one Cousins, who did the work. This location was intended to be, and was, substantially identical with the original Davis location. Cousins testified that Davis had previously shown him the lines and corners, and in January, 1900, defendant Oscar Dyer, in company with Davis, showed him some of the lines and corners. Speaking of the relocation in November, 1900, he testified: "At the time I located this claim I went all over it. As for mining work there was a small hole dug on it, in some small places it was picked a little. There was n't a square yard of dirt or rock moved in any one place. I don't think it would amount to a cubic yard." When Oscar Dyer was with Cousins in January, 1900, he told Cousins that his brother (defendant) claimed the ground west of the southeast corner of the Davis claim, and that more than the assessment-work had been done. Cousins testified: "I then said that I had seen they had. But it was n't on what we claimed—they had n't hit a lick of work on what we claimed—north of our south line he had done a lot of work upon the hill and on the ground we did n't claim."

It appears from plaintiff's testimony that he relocated the Cuban Beauty No. 2, because of some doubt of the legality of the Davis location, under the State Mining Law of 1897, and his attempt to do the assessment-work was in order to hold the claim if the Davis location was legal. As to the relocation in 1900, the assessment-work becomes immaterial, as it might be done at any time during the year 1901, and the action was tried in August of that year. It also appeared from plaintiff's testimony that he acquired all the Davis group of claims, and the contract of sale calls for the payment of one hundred and twenty-five thousand dollars for all the mines. There were some others besides the three mentioned by plaintiff in his testimony following: "There were three claims—the Cuban Beauty, the Cuban Beauty No. 2 and the Admiral Dewey, and that work [the assessment-work for 1899] on the Admiral Dewey was supposed to develop the three claims, and was done for that purpose, and then I did the assessment-work for those three claims on the Admiral

Dewey. I spent about three thousand dollars on the Admiral Dewey for the time in doing it. I ran about 500 feet of tunnels and then I built some buildings and then I fixed the trail and general development of the mining claims.'' Allen Davis testified that he was working on the Dewey Mine about May 1, 1899, and met defendant William Dyer there at that time, and in a conversation Dyer, in reply to a question as to the line between sections 6 and 7, and as to whether his location extended into section 6, pointed out about where the section-line was, and stated: ''I have n't got anything in 6, all of mine is in section 7.'' The south line of the Cuban Beauty No. 2 is admittedly a considerable distance north of this section-line,—''three or four hundred feet'' as testified by witness Cousins. Dyer's claims did in fact extend on to section 6, and he probably meant no more in his statement to Cousins and those present, than that he claimed nothing within the lines of the Davis location of the Cuban Beauty No. 2. Dyer knew where the section-line was, and so testified. The court found that the Squaw Creek No. 2 included some of the ground embraced in the Cuban Beauty No. 2.

It is not necessary to discuss the validity of the original location by Davis, for the court found that it was not made in conformity with the state law (Stats. 1897, p. 214), and the finding cannot be questioned by plaintiff. (*Cowing* v. *Rogers*, 34 Cal. 648.) Nor do we think it necessary to examine the evidence particularly as to the validity of the Dyer locations, made about the same time, for they also failed to comply with the statute, and the court so found. Dyer subsequently posted a new notice January 14, 1899, recorded March 13, 1899. The statute above referred to was in force until February 28, 1899, when it was repealed. (Stats. 1899, p. 148.) Dyer claims under this location as well as his location in 1898. But we think the evidence fails to establish the validity of either location, while there is evidence showing the validity of plaintiff's location of November 26, 1900. As we understand the purpose of the evidence as to these early locations, it was not so much to show valid locations in fact as it was to show the intention of the locators as to the particular ground in question. Appellant's contention is, that he took all the ground south and west of a line drawn from the southeast corner of the Brown Bear claim to what is now claimed

by plaintiff to be the southeast corner of the Cuban Beauty No. 2; and as the Brown Bear claim lay west of the Cuban Beauty No. 2, and extended only about six hundred feet along the latter, the said line would cut off more than a third of the southwest portion of the Cuban Beauty No. 2, including the ledges and rock in place found on the latter by Davis, its original locator. This contention of appellant is based largely on evidence that Davis himself conceded this to be the dividing-line in February, 1890, when he and appellant and some other persons were on the ground for the purpose of ascertaining its location. It appeared, however, that when Davis took the party to what in fact was the southeast corner of his claim, he by mistake told them it was the southwest corner, and that his southeast corner lay over east near the Chadwick claim. The evidence here is in sharp conflict, and there is evidence that the Cuban Beauty No. 2 was laid out originally as claimed by plaintiff, and that when Davis pointed east for his southeast corner he by mistake called it the southwest corner, which would thus cut off the triangular piece in the southwest part of the claim. This was all cleared up to the satisfaction of the trial court, and as there was evidence to support its conclusion, it cannot now be disturbed. Besides, the trial court held that as these declarations of Davis were made after he had sold the property to plaintiff, they were inadmissible as affecting plaintiff's title, and this ruling, though objected to at the time, is not now questioned. The bearing of this evidence was confined to its effect upon statements of plaintiff's witnesses as to where the lines of plaintiff's claim were in fact located. Appellant used at the trial a plat by way of illustration. Much of the evidence brought out in connection with this map is so reported as to be unintelligible here, though doubtless was understood by the trial judge. The diagram was not proven to be correct. It furnishes us but little aid because not drawn to show the exact situation of the several claims referred to in the evidence, and is but an approximation of their relation to each other. It is confusing by reason of this fact, and also because the top of the map is south instead of north, which latter is the usual and better method of preparing illustrative maps. From the best consideration we can give of the evidence with this map in hand, we think the findings are supported.

The principal point urged by appellant is, that he was in possession of the contested ground when plaintiff made his last location, and therefore it was not unoccupied mineral land and subject to location by plaintiff.

Defendant claims from the evidence that the man sent to relocate the claim for plaintiff was driven off by defendant before he did any work; that defendant had a dwelling-house on the claim, was living in it and working on the claim, and had done about two thousand dollars' worth of work on it, and had the claim marked off so that the boundaries could be readily traced. And it is claimed that plaintiff had to commit a trespass upon the ground in order to locate. The decisions are not entirely harmonious as to whether an occupation such as is described above under an invalid location would be sufficient to prevent a valid location being made by another qualified person, provided he could do so without the use of force. The question is not necessarily involved in this case. There is evidence which the trial court accepted, showing that the facts are not as above claimed. Defendant had done much work on a claim at considerable distance from plaintiff's claim, and he had a dwelling-house on one of his claims, but it was a mile from plaintiff's claim. There was evidence that these improvements were not on any claim that encroached upon plaintiff's claim. Defendant's map shows a cabin which was erected by defendant more recently, but it is not on plaintiff's claim. The only work done by defendant on any part of plaintiff's claim is described as of but small extent.

The evidence is not that Cousins, who made plaintiff's location, was driven off by defendant at the time the location was made. This circumstance happened some time before, when he went there to do assessment-work under the Davis location. So far as the evidence shows, Cousins made the relocation peaceably and without interruption or objection by any person. He was familiar with the lines by previous examination of them, and he testified that when he relocated the claim he went all over it and found only such evidences of work on it as have been already stated. He found no person on any part of the claim and no one in actual possession of any part of it. The utmost that can be said of the evidence in support of defendant's contention is, that he had an in-

valid location on which he had done much work outside the boundaries of the claim in dispute; that he claimed that his location overlapped and included some of plaintiff's ground, and that in 1899 he had done some prospecting-work on the disputed ground, but was not working this ground when plaintiff's relocation was made.

In view of this state of facts, the case of *Belk* v. *Meagher,* 104 U. S. 279, would seem to settle the question against defendant's contention. In that case Belk attempted to make a location in December, 1876, and did everything necessary to a valid location if the ground was then subject to location. There was, however, a prior locator whose rights precluded a valid location by Belk. This prior locator's rights expired on January 1, 1877, and were in fact then lost. Belk claimed that upon the failure of the prior locator to keep his location alive his (Belk's) location, made in December, at once attached. The court held that it did not so operate. Between December 19th and February 21st following Belk did a small amount of work on the claim, which did not occupy more than two days of his time, and he had no other possession of the property than such as arose from his location of the claim and his occasional labor upon it. On February 21, 1877, defendants Meagher and others entered on the property peaceably and made another relocation, doing all that was required to perfect their rights, if the premises were then open to them. After showing that the rights of Belk were not affected by the Montana statute, and that his right of location depended entirely on the act of Congress, the court said: "All he got or could get by his entry was possession, and that, to be of any avail, must be actual. Under the provisions of the Revised Statutes relied on, Belk could not get a patent for the claim he attempted to locate, unless he secured what is here made the equivalent of a valid location, by actually holding and working for the requisite time. If he actually held possession and worked the claim long enough and kept others out, his right to a patent would be complete. He had no grant of any right of possession. His ultimate right to a patent depended entirely on his keeping himself in and all others out, and if he was not actually in, he was in law out. A peaceable adverse entry, coupled with the right to hold possession which was thereby acquired,

operated as an ouster, which broke the continuity of his holding and deprived him of the title he might have got if he had kept it for the requisite length of time. He made no such location as prevented the lands from being in law vacant. Others had the right to enter for the purposes of taking them up if it could be done peaceably and without force." The court then said: "There is nothing in *Atherton* v. *Fowler* (96 U. S. 513) to the contrary of this." Applying the principles of *Belk* v. *Meagher,* 104 U. S. 279, we must hold that defendant acquired no right to the disputed land which constituted it other than unoccupied public land or precluded plaintiff from making a valid location thereon. See the question discussed and cases cited *pro* and *con* in Lindley on Mines (2d ed., vol 1, secs. 216-219). *Belk* v. *Meagher* also disposes of appellant's further contention that the repeal of the act of 1897 did not impair his rights vested by virtue of his invalid location. He could only claim such land as he actually possessed and was working in good faith.

The judgment and order should be affirmed.

Gray, C., and Smith, C., concurred.