UNITED STATES ex rel. SEJNENSKY v. TOD, Commissioner, etc.

(Circuit Court of Appeals, Second Circuit. November 14, 1922.)

No. 45.

1. Aliens ⚖=62—Immigration law does not add to qualifications for naturalization.

Immigration Act Feb. 5, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 4289¼a–4289¼u), prescribing the classes of aliens who may enter the United States, and excluding numerous classes who are entitled to become citizens by naturalization under Comp. St. § 4351 et seq., does not require courts to refuse to naturalize a person qualified under the Naturalization Act, because he was not qualified to enter the United States under the immigration laws.

2. Civil rights ⚖=2—Immigration laws do not apply to person owing allegiance here.

The immigration laws refer to persons owing allegiance to a foreign government, and do not apply to citizens owing permanent allegiance to this country.

3. Civil rights ⚖=1—Congress can exclude aliens, but not citizens.

Congress may forbid aliens or classes of aliens from coming into the United States, and may provide for their expulsion, but it cannot exclude therefrom any citizen, unless he is convicted of a criminal offense, or is a fugitive from the justice of some foreign state, which demands his extradition.

4. Citizens ⚖=7—Act denying citizenship by marriage of sexually immoral female to citizen is construction other marriage gives it.

The provision of Immigration Act 1917, § 19 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼jj), that marriage to an American citizen of a sexually immoral female shall not give her citizenship, if it is solemnized after her arrest, or after her commission of acts which make her liable to deportation, is a construction by Congress that, without the enactment, such a marriage would make the woman a citizen and prevent her deportation, and a manifestation of intention that the marriage of a woman to a citizen should confer citizenship except in the case specified.

5. Citizens ⚖=7—Marriage of immigrant woman held for deportation to American citizen gives her citizenship.

A female immigrant, who had been ordered deported as a feeble-minded person and released on bond to visit her relatives in this country, and who, while on bond, married an American citizen, became herself an American citizen, under Rev. St. § 1994 (Comp. St. § 3948), providing that a woman who marries an American citizen, and who might be lawfully naturalized shall be deemed a citizen, since the naturalization to feeble-minded persons and the requirement of qualification for natur-

alization means only that the woman shall belong to a class which could become naturalized, not that she possesses the residential qualifications, provided such marriage took place before the enactment of Act Sept. 22, 1922, providing that marriage to a citizen does not give citizenship, and repealing section 1994.

Appeal from the District Court of the United States for the Southern District of New York.

Habeas corpus proceeding by the United States, on the relation of Dora Sejnensky, against Robert E. Tod, as Commissioner of Immigration. From an order sustaining the writ, and discharging the relator from the custody of the Commissioner, the Commissioner appeals. Affirmed.

William Hayward, U. S. Atty., and James C. Thomas, Jr., Asst. U. S. Atty., both of New York City, for appellant.

Jacob H. Corn, of New York City, for appellee.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge. This appeal is from an order sustaining a writ of habeas corpus discharging from the custody of the Commissioner of Immigration at the port of New York Dora Sejnensky, an alien who was excluded from the United States on the ground that she was feeble-minded. She thereupon appealed to the Commissioner General of Immigration at Washington, and the exclusion order was modified to the extent of allowing her to land temporarily for six months to visit her relatives, under a bond of $1,000. At the time of her arrival in the United States she was unmarried, but prior to the expiration of the six months period above mentioned, and on October 28, 1921, she was married to a citizen of the United States, one Samuel J. Rose, of the borough of Brooklyn, in the city of New York; the marriage being celebrated at Bayonne, N. J. It is claimed that by virtue of her marriage the relator herself became a citizen of the United States and as such is entitled to remain in this country.

The facts of the marriage were brought to the knowledge of the Commissioner of Immigration by the relator's brother, in a letter to the Commissioner informing him of the facts, and that he claimed that she was now, by virtue of her marriage, a citizen of the United States, and therefore was entitled to remain in this country. He requested the Commissioner to inform the authorities at Ellis Island as to her status. Like information was also communicated to the Commissioner in a letter addressed to him by the husband of the relator, who requested the Commissioner to cancel the bond for $1,000 which had been given to permit her to land temporarily, and asking that she be granted admission to the United States..

The relator was, however, on November 7, 1921, again duly examined by a medical board, which found, six months after the first examination, that there was no change in her mental condition as previously found. Thereupon, on December 29, 1921, the Secretary of Labor directed that the relator's deportation be proceeded with, and that demand be made upon the bondsman for the specific performance of

the bond, and that the alien should be delivered to the Commissioner of Immigration at the port of New York on or before January 15, 1922. The relator was so delivered, and on February 1, 1922, a writ of habeas corpus was sued out in the United States District Court for the Southern District of New York. The Commissioner filed his return to the writ, the matter was argued, and the District Judge entered an order on February 3, 1922, sustaining the writ and discharging the relator from the custody of the Commissioner, and this appeal was taken from that order.

The question presented is whether the relator is still subject to deportation. Stated in another form, it is whether an alien woman, who on her arrival in this country is adjudged to be feeble-minded and ordered deported, and who thereafter in good faith contracts a valid marriage with an American citizen, thereby herself acquires the rights of an American citizen, so as to entitle her to remain in the United States, notwithstanding the order for her deportation by the immigration authorities.

All the relatives of the relator are in this country, including her father, her six brothers, and her two sisters. The brothers are each of them citizens of the United States. One of the brothers has been here for 24 years, and another for 21 years. One of the brothers was a member of the Naval Reserve, and another was an honorably discharged veteran, who had been overseas. She and her father came here to be with the rest of the family; her mother being no longer alive. All the family appear to have been leading respectable lives. Their affairs are represented "as getting along nicely," and they are said to be "all very happy here." The man she has married, in his petition for the writ of habeas corpus, states upon his oath as follows concerning her:

"Although it is said that she is below normal, I have always found her to be well able to take care of herself. She can cook, sew, do general housework. and is very industrious. There is no danger that she will ever become a public charge, by reason of my own ability and that of her numerous relatives here to take care of her. * * * To send her back would be to separate her from me, her husband, and from all her other relatives, although she is an American citizen, as petitioner is informed and verily believes. Annexed is my mother's affidavit showing my birth in this country."

This case involves the immigration and the naturalization laws of the United States. The immigration laws prescribe the classes of aliens who may enter the United States. They exclude certain classes from admission among which are all idiots, imbeciles, feeble-minded persons, epileptics, insane persons, persons who have had one or more attacks of insanity at any time previously, persons of constitutional psychopathic inferiority, persons with chronic alcoholism, paupers, professional beggars, vagrants, persons afflicted with tuberculosis in any form, or with a loathsome or dangerous or contagious disease, persons found to be mentally or physically defective, such physical defect being of a nature which may affect the ability of such alien to earn a living, persons who have been convicted or admit having committed a felony or other crime or misdemeanor involving moral turpitude,

polygamists or persons who practice polygamy, or believe in or advocate the practice of polygamy, anarchists, or persons who believe in or advocate the overthrow by force or violence of the government of the United States, or of all forms of law, or who disbelieve in or are opposed to organized government, or who advocate the assassination of public officials, or who advocate or teach the unlawful destruction of property. The foregoing are some, but by no means all, of the classes of aliens who cannot be admitted into the United States under the existing laws. See Act Feb. 5, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 4289¼a–4289¼u).

The naturalization laws prescribe the classes of aliens who may become citizens of the United States; and to entitle one to become a citizen by naturalization it is necessary that the alien should be: (1) A free white person, or one of African nativity or descent. (2) A resident of the United States for the continued term of five years next preceding admission to citizenship (subject to certain exceptions not necessary to be now considered) and within the jurisdiction of the court admitting the alien for a period of one year. (3) Possessed of a good moral character. (4) Attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States. U. S. Compiled Statutes (1916) vol. 5, tit. 30, pp. 5215, 5255. And under the act of June 29, 1906 (34 Stat. 596) no person can be made a citizen who is opposed to organized government, or who is a polygamist, or who cannot speak the English language.

[1] It is thus apparent that the conditions under which aliens are entitled to enter the United States, and the conditions under which aliens are entitled to become citizens are quite different. The immigration laws add nothing to the naturalization laws by excluding persons who are feeble-minded, or who are afflicted with tuberculosis, or with a loathsome or dangerous disease, or who are of constitutional psychopathic inferiority; for there is nothing in the statutes which provides that a court must refuse to naturalize a person afflicted with a dangerous or loathsome disease, or because they are mentally defective, or of constitutional psychopathic inferiority, or because they have entered the country as "contract laborers," although, of course, the court may in its discretion after inquiry refuse to admit among others those it finds to be lacking in knowledge of the Constitution or our system of government.

[2, 3] The immigration laws of the United States, in terms and by judicial construction, relate to persons owing allegiance to a foreign government. They do not apply to citizens owing permanent allegiance to this country. Gonzales v. Williams, 192 U. S. 1, 24 Sup. Ct. 171, 48 L. Ed. 317. So that, if the relator has become by her marriage a citizen of the United States, the immigration authorities have lost all power over her, and are without authority to deport her. That Congress may pass laws forbidding aliens or classes of aliens from coming within the United States and may provide for their expulsion is certain. Low Wah Suey v. Backus, 225 U. S. 460, 32 Sup. Ct. 734, 56 L. Ed. 1165; Wong Wing v. United States, 163 U. S. 228, 16 Sup. Ct.

977, 41 L. Ed. 140. The principle is not questioned by any one in this proceeding. But it is equally plain, we take it, that Congress cannot exclude from the United States any citizen of the United States, unless convicted of a criminal offense, or unless he is a fugitive from the justice of some foreign state which demands his extradition.

Immigration Act Feb. 5, 1917, c. 29, 39 Stat. 874, § 3, provides as follows:

"That the following classes of aliens shall be excluded from admission into the United States: All idiots, imbeciles, feeble-minded persons. * * *"

Section 1994 of the Revised Statutes (Comp. St. § 3948) provides as follows:

"Any woman who is now or may hereafter be married to a citizen of the United States, and who might herself be lawfully naturalized, shall be deemed a citizen."

Section 1994 of the Revised Statutes is said to originate in the Act of Congress of February 10, 1855 (10 Stat. 604, c. 71), which in its second section provided:

"That any woman, who might lawfully be naturalized under the existing laws, married, or who shall be married to a citizen of the United States, shall be deemed and taken to be a citizen."

And the American statute of 1855 is substantially a copy of the earlier British statute, 7 and 8 Victoria, c. 66, § 16, 1844, which provided that:

"Any woman married, or who shall be married, to a natural-born subject or person naturalized, shall be deemed and taken to be herself naturalized, and have all the rights and privileges of a natural born subject."

The Act of Congress of September 22, 1922 (42 Stat. 1021), being "An act relative to the naturalization and citizenship of married women," in section 2, provides:

"That any woman who marries a citizen of the United States after the passage of this act, * * * shall not become a citizen of the United States by reason of such marriage. * * *"

Section 6 of the act also provides:

"That section 1994 of the Revised Statutes * * * are repealed."

Section 6 also provides that "such repeal shall not terminate citizenship acquired or retained under either of such sections, * * *" meaning sections 2 and 6. So that this Act of September 22, 1922, has no application to the facts of the present case, as the marriage of the relator took place prior to its passage. This case, therefore, depends upon the meaning to be attached to section 1994 of the Revised Statutes.

In 1868 the Supreme Court, in Kelly v. Owen, 7 Wall. 496, 498 (19 L. Ed. 283), construed this provision as found in the act of 1855 as follows:

"The term, 'who might lawfully be naturalized under the existing laws,' only limits the application of the law to free white women. The previous Naturalization Act, existing at the time, only required that the person applying for its benefits should be 'a free white person' and not an alien enemy."

This construction limited the effect of the statute to those aliens who belonged to the class or race which might be lawfully naturalized, and did not refer to any of the other provisions of the naturalization laws, as to residence or moral character, or to any of the provisions of the immigration laws relating to the exclusion or deportation of aliens.

In 1880 in Leonard v. Grant (C. C.) 5 Fed. 11, District Judge Deady also construed the act of 1855, declaring that "any woman who is now or may hereafter be married to a citizen of the United States, and might herself be lawfully naturalized, shall be deemed a citizen." He held that "upon the authorities, and the reason, if not the necessity, of the case," the statute must be construed as in effect declaring that an alien woman, who is of the class or race that may be lawfully naturalized under the existing laws, and who marries a citizen of the United States, is such a citizen also, and that it was not necessary that it should appear affirmatively that she possessed the other qualifications at the time of her marriage to entitle her to naturalization.

In 1882, the act of 1855 came before Mr. Justice Harlan, sitting in the Circuit Court, in United States v. Kellar, 13 Fed. 82. An alien woman, a subject of Prussia, came to the United States and married here a naturalized citizen. Mr. Justice Harlan, with the concurrence of Judge Treat, held that upon her marriage she became ipso facto a citizen of the United States as fully as if she had complied with all of the provisions of the statutes upon the subject of naturalization. He added:

"There can be no doubt of this, in view of the decision of the Supreme Court of the United States in Kelly v. Owen, 7 Wall. 496, 19 L. Ed. 283."

The alien "belonged to the class of persons" who might be lawfully naturalized.

In 1904 in Hopkins v. Fachant, 130 Fed. 839, 65 C. C. A. 1, an alien woman came to the United States from France and entered the country contrary to the immigration laws. The immigration authorities took her into custody at the port of New York, with the view of deporting her. She applied for her release under a writ of habeas corpus, and pending the disposition of the matter she married a naturalized American citizen. The Circuit Court of Appeals for the Ninth Circuit held, affirming the court below, that she was entitled to be discharged from custody. The court declared that:

"The rule is well settled that her marriage to a naturalized citizen of the United States entitled her to be discharged. The status of the wife follows that of her husband, * * * and by virtue of her marriage her husband's domicile became her domicile."

In 1908 the Circuit Court for the District of Rhode Island in Re Rustigian, 165 Fed. 980, had before it the application of a husband for his final decree of naturalization. It appeared that at that time his wife was held by the immigration authorities at New York on the ground that she was afflicted with a dangerous and contagious disease. Counsel on both sides agreed that the effect of the husband's naturalization would be to confer citizenship upon the wife. In view of that contingency District Judge Brown declined to pass upon the husband's

application for naturalization, and thought it best to wait until it was determined whether the wife's disease was curable. He placed his failure to act on the express ground that the effect of naturalizing the husband might naturalize her. At the same time he expressed his opinion that the husband's naturalization would not effect her naturalization, as she was not one who could become lawfully naturalized. "Her own capacity [to become naturalized]," the court stated, "is a prerequisite to her attaining citizenship. If herself lacking in that capacity, the married status cannot confer it upon her." Nothing, however, was actually decided in that case, and the views expressed therein are really nothing more than mere dicta. But, if they can be regarded as something more than that, we find ourselves, with all due respect for the learned judge, unable to accept them.

In 1909 in United States v. Williams, 173 Fed. 626, District Judge Learned Hand held that an alien woman, a subject of the Turkish Empire, who married an American citizen while visiting Turkey, and then came to the United States, could not be excluded, although she had, at the time of her entry, a disease which under the immigration laws would have been sufficient ground for her exclusion, if she had not had the status of a citizen. The case was brought into this court on appeal, and in 1911 was affirmed in 184 Fed. 322, 106 C. C. A. 464. In that case, however, at the time the relators married, they might have been lawfully naturalized, and we said:

"Even if we assume the contention of the district attorney to be correct, that marriage will not make a citizen of a woman who would be excluded under our immigration laws, it does not affect these relators."

We held that, being citizens, they could not be excluded as aliens; and it was also said to be inconsistent with the policy of our law that the husband should be a citizen and the wife an alien. The distinction between that case and the one now before the court is that in the former case the marriage took place before any order of exclusion had been made, while in this the marriage was celebrated after such an order was made. But such an order is a mere administrative provision, and has not the force of a judgment of a court, and works no estoppel. The administrative order is based on the circumstances that existed at the time the order of exclusion was made. If the circumstances change prior to the order being carried into effect, it cannot be executed. For example, if an order of exclusion should be based on the ground that the alien was at the time afflicted with a contagious disease, and it should be made satisfactorily to appear prior to actual deportation that the alien had entirely recovered from the disease, we think it plain that the order could not be carried into effect. So in this case, if after the making of the order of exclusion and while she is permitted temporarily to remain she in good faith marries an American citizen, we cannot doubt the validity of her marriage, and that she thereby acquired, under international law and under section 1994 of the Revised Statutes, American citizenship and ceased to be an alien. Thereupon the immigration authorities lost their jurisdiction over her, as that jurisdiction applies only to aliens, and not to citizens.

235 F.—34

In 1910 District Judge Dodge, in Ex parte Kaprielian, 188 Fed. 694, sustained the right of the officials to deport a woman under the following circumstances: She entered this country in July, 1910, being an alien and having been born in Turkey. She was taken into custody by the immigration authorities in the following September, and in October a warrant for her deportation was issued. Pending hearings as to the validity of that order, she was paroled in the custody of her counsel. The ground alleged for her deportation was that she was afflicted with a dangerous and contagious disease at the time of her entry. One of the reasons assigned to defeat deportation was that the woman had married a citizen of the United States pending the proceedings for her deportation. Judge Dodge declared himself unable to believe that a marriage under such circumstances "is capable of having the effect claimed, in view of the facts shown." He held that it was no part of the intended policy of section 1994 to annul or override the immigration laws, so as to authorize the admission into the country of the wife of a naturalized alien not otherwise entitled to enter, and that an alien woman who is of a class of persons excluded by law from admission to the United States does not come within the provisions of that section. The court relied wholly upon the dicta contained in the Rustigian Case. No other authorities were cited.

In 1914, District Judge Neterer, in Ex parte Grayson, 215 Fed. 449, construed section 1994 and held that where, pending proceedings to deport an alien native of France as an alien prostitute, she was married to a citizen of the United States, she thereby became a citizen, and was not subject to deportation until her citizenship was revoked by due process of law. It was his opinion that if, as was contended, her marriage was conceived in fraud, and was entered into for the purpose of evading the immigration laws and preventing her deportation, such fact should be established in a court of competent jurisdiction in an action commenced for the purpose. The case was appealed and the appeal dismissed. 219 Fed. 1022, 134 C. C. A. 666.

It is interesting also to observe the construction placed upon the language of the statute by the Department of Justice. In 1874, Attorney General Williams, 14 Op. Atty. Gen. 402, passing upon the Act of February 10, 1855, held that residence within the United States for the period required by the naturalization laws was not necessary in order to constitute an alien woman a citizen; she having married a citizen of the United States abroad, although she never resided in the United States, she and her husband having continued to reside abroad after the marriage.

In 1909, a similar construction was given to the Immigration Act of May 5, 1907, in an opinion rendered by Attorney General Wickersham. It appeared an unmarried woman, 28 years of age and a native of Belgium, arrived in New York and went at once to a town in Nebraska, where she continued to reside. About 15 months after her arrival she was taken before a United States commissioner by way of instituting proceedings under the Immigration Act (34 Stat. 898) for her deportation, on the ground that she had entered this country for the purpose of prostitution and had been found an inmate of a house of pros-

titution and practicing the same within three years after landing. It appeared, however, that after she was taken before the United States commissioner, but prior to her arrest under a warrant by the Department of Justice, she was lawfully married to a native-born citizen of the United States. The woman professed at the time of her marriage an intention to abandon her previous mode of life and to remove with her husband to his home in Pennsylvania. He knew what her mode of life had been, but professed to believe in her good intentions. The question was raised as to the right to deport her; the claim being advanced that by her marriage she had become an American citizen and therefore could not be deported. The Attorney General ruled against the right to deport her as she had become an American citizen. He held that the words "who might herself be lawfully naturalized" refer to a class or race who might be lawfully naturalized, and that compliance with the other conditions of the naturalization laws was not required. 27 Op. Atty. Gen. 507.

[4] Before concluding this opinion, we may add that it has not escaped our observation that Congress, in enacting the Immigration Act of 1917, so as to provide in section 19:

"That the marriage to an American citizen of a female of the sexually immoral classes * * * shall not invest such female with United States citizenship if the marriage of such alien female shall be solemnized after her arrest or after the commission of acts which make her liable to deportation under this act."

Two conclusions seem irresistibly to follow from the above change in the law:

(1) Congress deemed legislation essential to prevent women of the immoral class avoiding deportation through the device of marrying an American citizen.

(2) If Congress intended that the marriage of an American citizen with an alien woman of any of the other of the excluded classes, either before or after her detention, should not confer upon her American citizenship thereby entitling her to enter the country, its intention would have been expressed, and section 19 would not have been confined solely to women of the immoral class.

[5] In view of the language of section 1994 and the construction which the courts have almost uniformly given to it, we think it plain that Dora Sejnensky, being a woman who might herself be lawfully naturalized, by her marriage on October 28, 1921, to Samuel J. Rose, a citizen of the United States, acquired American citizenship, and as such is not subject to deportation under the immigration laws. We may add that there is no evidence before us showing that the marriage was illegal, or that it was entered into merely to evade the immigration laws, and with no intention on the part of the parties to live together as husband and wife.

The order sustaining the writ of habeas corpus, and discharging Dora Sejnensky from custody, is affirmed.