## UNITED STATES ex rel. PATTON v. TOD.

(Circuit Court of Appeals, Second Circuit.   March 10, 1924.)

No. 259.

**1. Citizens ⚹9—Effect of statutes relating to status of minor child of naturalized alien stated; "dwelling;" "permanent residence."**

In view of the history of the statutes, Rev. St. § 2172 (Comp. St. § 4367), was not wholly repealed by Act March 2, 1907, § 5 (Comp. St. § 3962), but each confers rights in two different situations.  Under the former a foreign-born child dwelling in the United States at the time of the naturalization of the parent automatically becomes a citizen, while under the latter a foreign-born child, not in the United States when the parent is naturalized, becomes a citizen from the time that, while still a minor, it begins to reside permanently in the United States, and under each statute the "dwelling" or "permanent residence" must have a lawful inception.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Dwell; Reside.]

**2. Statutes ⚹217—Report of committee recommending bill may be consulted in construing statute.**

The report of a committee of either house of Congress recommending the passage of a bill, and explanatory statements in the nature of a supplementary report, made by a committee member in charge of the bill during its passage, may be consulted to ascertain the intent of the law making body in its enactment.

**3. Aliens ⚹53—Executive officers without discretion to admit alien duly found to be imbecile.**

Under Act March 26. 1910. § 1, Act Feb. 5, 1917. § 3 (Comp. St. 1918, Comp. St. Ann. Supp. 1919. § 4289¼b), and Act Feb. 20, 1907, § 10, subject only to review by the courts. the executive officers of the government have no discretion to admit to the United States a person duly found to be an imbecile by a board of special inquiry on the certificate of the medical examiner.

**4. Aliens ⚹53—Executive officers without authority temporarily to admit mentally disabled aliens; "reside permanently;" "dwell."**

Neither Act Feb. 20, 1907, § 26, nor Act Feb. 5, 1917, § 21 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼kk), confers any authority on executive officers temporarily to admit into the United States aliens suffering mental disability, on bond guaranteeing departure, and one so admitted did not at any time begin to "reside permanently" or to "dwell" in the United States, within Rev. St. § 2172 (Comp. St. § 4367), or Act March 2, 1907, § 5 (Comp. St. § 3962), relative to citizenship of minor children of naturalized aliens.

**5. Aliens ⚹54—May be deported, if proceedings are instituted within five years; "entry."**

Under Immigration Act Feb. 5, 1917, §§ 19, 20 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 4289¼jj, 4289¼k), construed together, an alien may be deported, if proceedings are instituted within five years after entry, though not completed until after expiration of that time; "entry" meaning the entry after alien is freed from restraint, so that he may physically enter the country, and not merely the arrival of the vessel in port.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Entry.]

Appeal from the District Court of the United States for the Southern District of New York.

Habeas corpus by the United States, on the relation of Hyman Patton, next friend and father of Pola Patton, infant, against Robert E. Tod, as Commissioner of Immigration of the Port of New York. From an order of the District Court (292 Fed. 243), dismissing the writ and remanding the infant to the custody of the Commissioner, relator appeals. Affirmed.

Certiorari granted 44 Sup. Ct. 454, 68 L. Ed. ——.

Appeal from an order dismissing a writ of habeas corpus and remanding the infant Pola Patton to the custody of the Commissioner of Immigration at the port of New York. For brevity, we refer to the opinion of the District Court in 292 Fed. 243, where the facts there recited are correctly set forth except in one respect. The court, apparently relying on a statement in the return, said: "She was, however, paroled in the custody of her father on August 23, 1921, for the reason that certain legislation was pending having in view legalizing the entry of defective aliens, who had been temporarily landed during the war, because of the impracticability of effecting deportation."

An examination, however, of the departmental correspondence, shows that on August 31, 1921, Landis, Assistant Commissioner of Immigration at Ellis Island, under date of August 13, 1921, wrote the Commissioner General of Immigration at Washington, D. C., asking for instructions as to Pola Patton. Under date of August 23, 1921, Henning, Assistant Secretary of Labor, telegraphed to the "Immigration Service" at Ellis Island, N. Y., "Release Paula Patton to her people or to any one who may call for her." It was not until February 17, 1923, that White, Second Assistant Secretary of Labor wrote the Commissioner of Immigration at Ellis Island to hold the warrants of arrest and deportation in view of the pendency of a bill in Congress having for its purpose the legalizing of the admission of this infant and others.

For convenient reference, it is desirable to summarize the essential events in chronological order.

(1) Prior to 1914, Hyman Patton, the father of the infant, duly entered the United States.

(2) July 6, 1914, his infant daughter, Pola Patton, applied for admission to the United States.

(3) July 9, 1914, a board of special inquiry decided that the infant be excluded and ordered deported, because, on examination, she was found and certified by the surgeons to be an imbecile.

(4) July 15, 1914, the infant was ordered deported by the Acting Secretary of Labor.

(5) August 6, 1914, the Acting Secretary of Labor directed "that the alien be temporarily admitted under bond guaranteeing departure at the expiration of a year or sooner, if directed. * * *"

(6) August 10, 1914, was the date of release of infant from Ellis Island. This is asserted in the petition and admitted in the return. It also appears in an official letter dated July 30, 1919 from Uhl, Assistant Commissioner at Ellis Island, to the Commissioner General of Immigration, stating: " * * * I call attention to the case of the imbecile alias Pesse Patum (Pola Patton) ex SS. Batavia July 6, 1914, she having been released from this station on August 10, 1914."

(7) July 15, 1915, the Assistant Secretary of Labor directed the Commissioner of Immigration at Ellis Island to call upon "the interested persons" to file a new bond at the expiration of the then existing bond. The record fails to disclose that any new bond was given.

(8) November 26, 1917, Hyman Patton was naturalized a citizen of the United States.

(9) July 30, 1919, Assistant Commissioner Uhl called the attention of the Commissioner General of Immigration to the case of Pola Patton in the letter quoted supra.

(10) August 6, 1919, the Acting Secretary of Labor issued a warrant for the arrest of Pola Patton, and also ordered that a hearing should be granted to enable her to show cause why she should not be deported.

(11) August 9, 1919, the warrant was served.

(12) August 19, 1919, a hearing was duly had before Inspector Jones, who recommended the cancellation of the warrant, on the ground that the child was a citizen of the United States by virtue of her father's naturalization.

(13) On September 27, 1919, further consideration of the case was deferred by the Department of Labor "until deportation to Russia becomes possible, at which time the alien should be re-examined as to her mental condition. * * * "

(14) April 18, 1921, the Department of Labor, per Assistant Secretary Henning, issued its warrant of deportation, wherein, inter alia, it was recited that "the alien Paula Patton, alias Pesse Pitum, who landed at the port of New York on the 10th day of August, 1914, has been found in violation of the Immigration Act of February 5, 1917, to wit: That she was an imbecile at the time of her entry into the United States, and that she was a person likely to become a public charge at the time of her entry. * * * "

(15) August 10, 1921 (the deportation warrant, supra, having been stayed by departmental order), the child was again examined by a board of three surgeons in the presence of her own physician and again found to be an imbecile. The board stated: "The certificate of imbecility previously issued in her case is hereby affirmed."

(16) August 13, 1921, Assistant Commissioner Landis reported the action of the medical board and asked for instructions, as stated supra.

(17) August 23, 1921, Assistant Secretary of Labor Henning telegraphed to release the child, as quoted supra.

(18) February 17, 1923, Second Assistant Secretary White gave instructions to hold the warrants for the reasons referred to supra.

April 10, 1923, Tod, Commissioner of Immigration at Ellis Island, inquired of the Commissioner General of Immigration what disposition was to be made of the case. April 23, 1923, the Commissioner General directed deportation to Lithuania. May 12, 1923, the writ of habeas corpus was allowed.

Two of the principal statutes to be considered are as follows:

Section 2172 of the Revised Statutes of the United States (Comp. St. § 4367) provides:

"Sec. 2172. [Children of Persons Naturalized under Certain Laws to be Citizens.] The children of persons who have been duly naturalized under any law of the United States, or who, previous to the passing of any law on that subject, by the government of the United States may have become citizens of any one of the States, under the laws thereof, being under the age of twenty-one years at the time of the naturalization of their parents, shall, if *dwelling* in the United States, be considered as citizens thereof; and the children of persons who now are, or have been, citizens of the United States, shall, though born out of the limits and jurisdiction of the United States, be considered as citizens thereof; but no person heretofore proscribed by any state, or who has been legally convicted of having joined the army of Great Britain during the Revolutionary War, shall be admitted to become a citizen without the consent of the Legislature of the state in which such person was proscribed." (Italics ours.)

Section 5 of the Act of March 2, 1907, 34 Stat. 1229 (Comp. St. § 3962), entitled "An act in reference to the expatriation of citizens and their protection abroad," reads as follows: "That a child born without the United States of alien parents shall be deemed a citizen of the United States by virtue of the naturalization of or resumption of American citizenship by the parent: Provided, that such naturalization or resumption takes place during the minority of such child: And provided further, that the citizenship of such minor child shall begin at the time such minor child begins to *reside permanently* in the United States." (Italics ours.)

Gilbert & Gilbert, of New York City (A. S. Gilbert and Godfrey Cohen, both of New York City, of counsel), for appellant.

William Hayward, U. S. Atty., of New York City (James C. Thomas, Asst. U. S. Atty., of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

MAYER, Circuit Judge (after stating the facts as above). In view of the finding of the medical board that Pola Patton was an imbecile, she was mandatorily excludable, as will appear infra. On the facts, several unrelated questions have arisen and require consideration.

[1] It is contended that, when the father became a naturalized American citizen, the child, by virtue thereof, also became an American citizen. Counsel for appellant contends that section 2172 of the United States Revised Statutes was not repealed by section 5 of the Act of March 2, 1907, while counsel for the United States urges that it was repealed.

In support of appellant's contention, it is urged that under R. S. U. S. § 2172, only those minor children who were dwelling in the United States at the time that the parent was naturalized became citizens of the United States; hence that the 1907 act was supplementary or in addition to R. S. U. S. § 2178, and provided for those cases where the minor child was still abroad at the time of the parent's naturalization, and therefore, as Pola Patton was "dwelling" in the United States when her father was naturalized, she became an American citizen under R. S. U. S. § 2172.

Counsel for the United States insists that section 5 of the Act of March 2, 1907, wholly repealed R. S. U. S. § 2178; but if not, and if R. S. U. S. § 2172, applies, then the child was not "dwelling" in the United States at the time her father was naturalized. Judge Winslow below, in a carefully considered opinion, expressed the view:

"The provisions of the first clause of section 2172, in so far as they apply to the children of aliens born *outside* the United States, are superseded by the Act of March 2, 1907, § 5, supra. If, however, the earlier statute were still applicable, the relator, to claim the status of citizen, must have been 'dwelling in the United States' at the time of her father's naturalization. There must, however, have been a legal landing."

As we do not agree fully either with the contentions of the respective sides or with the view of the District Judge, we think the most satisfactory approach is to follow the history of the statutes; for, in our opinion, the former statute was not wholly repealed, and the two statutes may be so construed as to be consistent with principles of statutory construction and to carry out the legislative intent. We remark in passing that it may be that the District Judge, with his attention concentrated on the facts in this case, meant to express the views which we shall state and to confine his construction of section 2172 to the cases of "children of aliens born outside of the United States," who come here after the naturalization of the parent.

1. The first Naturalization Act was passed by the First Congress and became law on March 26, 1790. 1 Stat. 103, 104. That act was repealed by the Act of January 29, 1795, 1 Stat. 414, 415, which was somewhat more elaborate, particularly providing for the applicant's renunciation of foreign sovereignty or allegiance. The language of section 3 of the act, however, so far as here concerned, was substantially the same as that of the act of 1790, and read:

"Sec. 3. * * * That the children of persons duly naturalized, dwelling within the United States, and being under the age of twenty-one years, at

the time of such naturalization, and the children of citizens of the United States, born out of the limits and jurisdiction of the United States, shall be considered as citizens of the United States. * * * "

Next came the Act of April 14, 1802, which repealed the act of 1795 and provided for some further details, and in section 4 (Comp. St. § 4367) dealt with the subject-matter referred to in section 3 of the act of 1795, supra. Section 4 became, with slight immaterial changes, section 2172 of the Revised Statutes of the United States, supra, and it will be understood that we are referring to the same statute, whether we speak of it as the act of 1802 or R. S. U. S. § 2172.

It will be noted that the order of the words in the act of 1802 is different from that in the act of 1795, and particularly in respect of the word "dwelling," and this accounts for the observation of Mr. Justice Washington, infra. The early cases as to the status of a minor child of a naturalized American citizen, where the child was born outside of the United States, came in connection with the determination of questions of inheritance or other property rights.

The first inclination might well be to construe the statute of 1802 as applying only to such minor children as were actually dwelling in the United States at the time of the naturalization of their parents. The Supreme Court, however, as early as 1809, held otherwise in Campbell v. Gordon, 6 Cranch, 176, 183, 3 L. Ed. 190. In that case, the object of the bill was to rescind a contract made between the appellant and Robert Gordon, the appellee, for the sale of a tract of land by the latter to the former, upon the ground of a defect of title. The land belonged to James Currie, a citizen of Virginia, who died seized thereof in fee, on April 23, 1807, intestate and without issue. James Currie had one brother of the whole blood, named William, who prior to October 14, 1795, was a subject of the king of Great Britain, but who emigrated to the United States and on the last-mentioned date was naturalized an American citizen. At that time William Currie had one daughter Janetta (after Mrs. Gordon), who was born in Scotland. She came to the United States in October, 1797 (after her father's naturalization), while an infant, during the life of her father, and thereafter continued to reside in Virginia. William Currie died prior to April 23, 1807.

It was urged by appellant that, under section 3 of the act of 1795, the words "at the time of such naturalization" applied as well to the residence of the child as to her age, and that the child must be in the United States at the time of the naturalization of the parent. The appellee contended that it was immaterial where the child was, if she was under age at the time of her father's naturalization. Speaking for the court, Mr. Justice Washington said:

"Whatever difficulty might exist as to the construction of the third section of the Act of the 29th of January, 1795, in relation to this point, it is conceived that the rights of citizenship were clearly conferred upon the female appellee by the fourth section of the Act of the 14th of April, 1802. This act declares that the children of persons duly naturalized under any of the laws of the United States, being under the age of 21 years at the time of their parent's being so naturalized, shall, if dwelling in the United States, be considered as citizens of the United States. This is precisely the case of Mrs. Gordon. Her father was duly naturalized; at which time she was an

infant; but she came to the United States before the year 1802, and was at the time when this law passed dwelling within the United States. It is therefore the unanimous opinion of the court that, at the time of the death of James Currie, Mrs. Gordon was entitled to all the right and privilege of a citizen. * * * "

Young v. Peck, 21 Wend. (N. Y.) 389, decided in 1839, went even further. The action was for ejectment, brought by the plaintiff, Mary Young, for the recovery of an undivided moiety of a house and lot whereof her father died seized in 1823. James Knox came to this country from Scotland in 1774, leaving the plaintiff there. He remained in this country from his first arrival until his death, and became a citizen of the United States prior to the year 1802. Plaintiff was born in 1769; was married in Scotland to George Young, probably previous to her coming of age. Her husband died about 1825, in 1830 she came to this country, and in 1834 commenced the ejectment action. The lower court had decided that plaintiff was an alien at the time of the descent cast, and consequently was not entitled to recover. The plaintiff sued out a writ of error, and the Supreme Court, in an opinion by Chief Justice Nelson, held that plaintiff was a citizen and reversed the judgment. Error was taken to the Court of Errors, and that court, by a divided court, in an opinion by Chancellor Walworth, affirmed the judgment of the Supreme Court. Peck v. Young, 26 Wend. (N. Y.) 613. The case was taken to the Supreme Court of the United States, but was dismissed without opinion, as the parties had reached a settlement. Peck v. Young, 1 How. 250, 11 L. Ed. 120. The case apparently invoked discussion and the courts were not clear as to the ground of decision. See Ludlam v. Ludlam (1860) 31 Barb. (N. Y.) 486–491, affirmed 26 N. Y. 356, 84 Am. Dec. 193.

There were several cases where the question arose as to a minor child born outside the United States, but dwelling here when the parent was naturalized. In all these cases, the courts held that the minor child became an American citizen upon the naturalization of the parent. West v. West (1840) 8 Paige (N. Y.) 433; State v. Penney (1850) 10 Ark. 621; O'Connor v. State (1860) 9 Fla. 215; North Noonday Mining Co. v. Orient Mining Co. (1880 C. C.), 6 Sawy. 299, 1 Fed. 522; State v. Andriano (1887) 92 Mo. 70, 76, 4 S. W. 263. But the question as to the American citizenship of a minor child born abroad, and either living there at the time of the parent's naturalization or afterward coming to the United States while still a minor, troubled not only the courts, but as well the State Department. As pointed out in Zartarian v. Billings (January 7, 1907) 204 U. S. 170, 174, 27 Sup. Ct. 182, 51 L. Ed. 428:

"The construction of this law and the meaning of the phrase 'dwelling in the United States' has been the subject of much consideration in the executive department of the government having to do with the admission of foreigners and the rights of alleged naturalized citizens of the United States. The rulings of the State Department are collected in Prof. Moore's Digest of International Law, vol. 3, p. 467 et seq. The department seems to have followed a rule established at an early period, and formulated with fullness in Foreign Relations for 1890, p. 301, in an instruction from Mr. Blaine to Minister Phelps, at Berlin, in which it was laid down that the naturalization

of the father operates to confer the municipal right of citizenship upon the minor child if, at the time of the father's naturalization, dwelling within the jurisdiction of the United States, or if he come within that jurisdiction subsequent to the father's naturalization and during his own minority."

The court, however, carefully refrained from deciding the latter question, stating:

"Whether, in the latter case, a child not within the jurisdiction of the United States at the time of the parents' naturalization, but coming therein during minority, acquires citizenship, is not a question now before us."

Reference to Prof. Moore's Digest discloses many decisions or instructions from the State Department which indicate the great difficulty which the department had in respect of R. S. U. S. § 2172. See, also, Van Dyne on Naturalization (1907) p. 198 et seq. Thus, prior to the enactment of the Act of March 2, 1907, the uncertainty as to the meaning of R. S. U. S. § 2172, was well understood by the judicial and executive branches of government.

It still remained with the legislative branch to deal with the subject-matter. For this part of the history of the Act of March, 1907, we are indebted to the Assistant United States Attorney for the government for his industry in collecting data both interesting and informing. On April 13, 1906, the Senate passed a joint resolution providing for a commission to examine into the subjects of citizenship of the United States, expatriation, and protection abroad, and to make the report and recommendations thereon to the Congress. S. Res. No. 30, 59th Congress, 1st Session. On June 6, 1906, the House Committee on Foreign Affairs, to which the joint resolution had been referred, reported in part as follows:

"It is the opinion of the committee that legislation is required to settle some of the embarrassing questions that arise in reference to citizenship, expatriation, and the protection of American citizens abroad. * * * We should be glad if the Secretary of State would select some of the gentlemen connected with the State Department who have given special attention to these subjects, have them prepare a report, and propose legislation that could be considered by Congress at the next session. * * *" Rept. No. 4784, 59th Cong. 1st Sess.

Agreeably with this suggestion, James B. Scott, Solicitor for the Department of State, David Jayne Hill, Minister to the Netherlands, and Gaillard Hunt, Chief of the Passport Bureau, were selected to make inquiry and report recommendations. Secretary of State Root transmitted the result of the labors of this committee to the consideration of the House. The report of the committee is highly interesting and valuable, and will be found in House Documents, vol. 72–326, Citizenship, Expatriation and Protection Abroad, 59th Congress, 2d Session, 1906–1907, at pages 138, 139, 140, 141 and 142. This volume is in the New York Public Library, Room 80, No. 5175.

This report examined in detail the many decisions dealing with this and other questions. It concluded that the decided cases had held that residence in the United States at the time of the naturalization of the parent, or, indeed, during minority, was unnecessary, and that whenever the child comes into this country he was to be treated as a citizen. This conclusion necessarily followed from the holdings

in Campbell v. Gordon, supra, and Young v. Peck, supra. The committee stated that the decisions of the courts left them—

"therefore with the following questions open for determination: First, must the child reside in America at the time of the father's naturalization, or is it sufficient that he come to America at any time before he reaches majority? And, secondly, is he to be considered a citizen before he acquires a residence in the United States; that is, does he become, as does the wife of one naturalizing himself in America, a citizen by virtue of such naturalization, irrespective of the place in which he lives?"

The committee's recommendation was as follows:

"(d) A minor and nonresident child, born without the United States of alien and nonresident parents, shall be deemed a citizen of the United States by virtue of the naturalization of the parent: Provided, however, that such naturalization take place during the minority of such child; and provided, further, that the citizenship of such minor child shall date from the entry of such minor into the United States permanently to reside therein."

What the Congress actually enacted was section 5 of the Act of March 2, 1907, quoted supra. An examination of this last-named act shows that it dealt also with questions of expatriation and resumption of American citizenship. Section 5, it will be observed, refers not only to naturalization but also to resumption. Van Dyne (whose book was published in 1907, and who had been an American consul and formerly Assistant Solicitor for the Department of State) sets forth at page 219 of his book that it was understood that this provision as to resumption was designed to meet the case of the foreign-born minor child of an American woman, who after the termination of her marriage with a foreigner resumes American citizenship.

In view of the history outlined, it seems plain that the Congress was dealing with foreign-born children who came to this country after the naturalization of the parent, or the resumption of citizenship by the parent, as the case might be. In the recommendation of the committee, quoted supra, it will be noted that the citizenship of the minor child was to date "from the entry of such minor into the United States permanently to reside there." Of the many possible situations there would be at least two with which the naturalization laws would deal: (1) Where the foreign-born minor child was here when the parent was naturalized; and (2) where the foreign-born minor child came here after the parent was naturalized. If the minor child entered this country prior to the naturalization of the parent and intended to remain here permanently, then upon its entry into this country it would "reside permanently in the United States," and when the parent was naturalized it would be so residing and certainly would be so dwelling. It could not have been intended that the citizenship of such minor child should begin at the time such minor child began to reside permanently in the United States. Any such construction would have been incongruous. To illustrate: Assume that a child came with its parent on January 1, 1910, lived continuously with the parent, and the parent was naturalized in 1915. It certainly could not be said that the citizenship of the child began on January 1, 1910.

We think this is the reason why the Act of March 2, 1907, did not contain any repealing clause. The courts had been unanimous in

holding that, if a foreign-born minor child was dwelling in the United States at the time of the naturalization of the parent, the child, under R. S. U. S. § 2172, became thereby naturalized. The statute in that regard was not ambiguous or doubtful, and did not need correction or amendment. The difficulty in construing the statute arose in the case of a minor child born outside of the United States, who came here after the naturalization of the parent, and it was to correct this difficulty and impose a more rigid restriction that section 5 of the Act of March 2, 1907, was enacted.

Giving to the two statutes under consideration this interpretation, we have a simple system under which each statute confers rights in two different situations. Under R. S. U. S. § 2172, a foreign-born minor child dwelling in the United States at the time of the naturalization of the parent automatically becomes an American citizen. Under section 5 of the Act of March 2, 1907, a foreign-born child, not in the United States when the parent is naturalized, becomes a citizen only from such time as, while still a minor, it begins to reside permanently in the United States. It is conceded that the status of a woman upon her lawful marriage to an American citizen relates to a different subject-matter, and that U. S. v. Tod (C. C. A.) 285 Fed. 523, 26 A. L. R. 1316, is not here relevant or controlling.

[2] This court (citing leading cases) has recently restated the rule that the report of a committee of either house of Congress recommending the passage of a bill may be consulted with the view of ascertaining the legislative intent. U. S. ex rel. Fazio v. Tod (C. C. A.) 285 Fed. 847, 851. The report, referred to supra, of the experts selected by the State Department was forwarded to the House by Secretary Root under date of December 18, 1906, with the statement:

° "I beg to commend it to the consideration of the House as a very clear and thorough exposition of this important subject, upon which it seems to be generally agreed legislation is much needed."

The letter of the Secretary of State with the report was referred to the Committee on Foreign Affairs, and on December 20, 1906, ordered to be printed. See page 1 of House Documents, vol. 72. It is thus entirely clear that the report was before the House during the progress of the legislation and at the time of its enactment, and that, owing to the official routine whereby this report was requested of and submitted by the Department of State, we may resort to it as an aid in ascertaining the intent of the Legislature.

Our attention is called to a statement made by Congressman Perkins, chairman of the Committee on Foreign Affairs of the House of Representatives, to which he reported the bill. From the extract submitted to us (Congressional Record 1907, p. 1464) it seems that the attention of Mr. Perkins was concentrated on the changes which related to the right to resume citizenship by a woman who had married a foreigner and whose marriage relation had terminated, and Mr. Perkins said, inter alia, that:

° "Under this act, the children of such a woman would have the same right as would the children of an alien to take American citizenship by coming to this country to reside permanently. Otherwise, I do not think it changes the law."

We are not enlightened as to the context, but we think the foregoing quotation from the statement of Mr. Perkins indicates that he regarded the position of the children of a woman who had resumed American citizenship as the same as that of children of an alien coming here to take American citizenship, in that in each case it was requisite that the "coming to this country" should be "to reside permanently." In other words, we think that what was said by Mr. Perkins is confirmatory of the views expressed by us supra. We have referred to this statement of the chairman of the Committee on Foreign Affairs, because resort to reports of committees "has been extended to include explanatory statements in the nature of a supplementary report made by a committee member in charge of a bill in course of passage." Duplex Co. v. Deering, 254 U. S. 433, 475, 41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196. See, also, New York & Cuba S. S. Co. v. United States (C. C. A. 2d Circuit, decided February 18, 1924) 297 Fed. 158.

But, whatever may be the construction of the remarks of Mr. Perkins, we think the report is so clear and the necessity of clarifying the act of 1802 was so apparent that there is no escape from the conclusion that, under existing law, Pola Patton could not become an American citizen until she began to reside permanently in the United States.

[3] 2. Whether, however, we look to R. S. U. S. § 2172, or section 5 of the Act of March 2, 1907, the result is the same. In the one statute the permanent residence contemplated must, of course, be a residence which shall be lawfully begun, and in the other statute the dwelling must likewise have a lawful inception and existence. When the act of 1802 became law, there was no immigration statute. Since then legislation in respect of immigration has become necessary, and we must look to the immigration statutes to ascertain when an alien can be regarded as beginning his residence in this country. We are not here concerned with the many questions, often difficult, of domicile and residence, which relate to inheritance rights, voting rights, and other classes of rights determined either by statutory or common-law definitions.

Pola Patton arrived on the steamship Batavia on July 6, 1914. Section 1 of the Act of March 26, 1910 (36 Stat. 263), and section 3 of the Act of February 5, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼b), are similar, in that they each provide:

"That the following classes of aliens shall be excluded from admission into the United States: All idiots, imbeciles, feeble-minded persons. * * *"

Under section 10 of the Act of February 20, 1907 (34 Stat. 901), the decision of the board of special inquiry, based upon the certificate of the examining medical officer, was final as to the rejection of aliens affected with any mental disability which would bring such aliens within the excluded classes referred to in section 2 of the act, which so far as affected imbeciles was the same as section 1 of the act of 1910 and section 3 of the act of 1917. The finality of decisions of the boards of special inquiry, with right of appeal to the Secretary of Labor, where the decision is based upon the certificate of the medical

examining officer, is reiterated in section 17 of the Act of February 5, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼ii). Subject, then, only to appropriate review by the courts, the executive officers of the government have no discretion whatever to admit to the United States a person duly found to be an imbecile by the appropriate officials in accordance with the procedure of the statutes just referred to. It was, therefore, not within the power of any one to admit Pola Patton. The duty mandatorily impressed by the statute was to exclude her.

[4] So far as affected her right or ability to begin a permanent residence in the United States, or her right or ability to dwell here, all the steps as to releasing her on bond and releasing her to her parents were immaterial. The Department of Labor had no discretion, and no act of that department or of any of its officers could so position this minor child as to enable her to be in a legal sense in this country. Indeed, we are unable to see under what authority she was permitted to come in upon the furnishing of a bond. We fully appreciate the practical problems with which the executive authorities were confronted during the period of the war, and what we say is not by way of criticism, but only in order to point out the question of power involved.

Under section 26 of the Act of February 20, 1907, the Secretary of Commerce and Labor had discretion upon the giving of a suitable bond to admit "any alien liable to be excluded because likely to become a public charge or because of physical disability other than tuberculosis or loathsome or dangerous contagious disease." Under section 21 of the Act of February 5, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼kk), substantially the same provision was enacted, so far as affects the subject-matter here under discussion. It will be noted that in neither act is any authority conferred upon the executive authorities to admit to bail a person suffering under a mental disability and this is quite in line with the policy of the United States, as expressed in another connection in the report of the Senate Committee, No. 352, 64th Congress, 1st Session, to accompany H. R. 10384, quoted in the margin.[1]

The distinction between those suffering from mental and physical disabilities, referred to in the report of the Senate Committee, supra, was undoubtedly a sound reason for not including among those ad-

---

[1] Report of the Senate Committee, Report No. 352, 64th Congress, First Session, to accompany H. R. 10384: "On page 5, line 1, the word 'mental or,' appearing before the word 'physical,' were stricken out of H. R. 6060, the object being to make the factor that determines rejection of the mentally defective the mere existence of the defect, not, as with the physically defective, the question whether the defect affects earning capacity. The reasons for excluding a physically defective alien are likelihood of his becoming a public charge and inability by his own exertions to care for himself and those dependent upon him, while the real object of excluding the mentally defective is to prevent the introduction into the country of strains of mental defect that may continue and multiply through succeeding generations, irrespective of the immediate effect thereof on earning capacity. This change was made only after consultation with persons of knowledge and experience, and is in line with the well-established public policy of rigidly excluding the mentally deficient."

missible to bail such aliens as were imbeciles or otherwise suffering from any mental disability mentioned in the statutory excluding provisions. It follows from the foregoing that Pola Patton could not and did not at any time begin to reside permanently or begin to dwell in the United States.

[5] 3. Referring to the statement of facts, it will be recalled that on August 6, 1914, the Acting Secretary of Labor directed that the alien be temporarily admitted under bond. August 10, 1914, was the date of release from Ellis Island. August 6, 1919, was the date when the warrant of arrest was issued. It is contended by appellant that the date when the statutory limitation under section 19 began was August 10, 1914, and not August 6, 1914. Section 19 of the Act of February 5, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 4289¼jj), provides:

"At any time within five years after entry, any alien, who at the time of entry was a member of one or more of the classes excluded by law, * * * shall, upon the warrant of the Secretary of Labor, be taken into custody and deported."

In view of what has been pointed out heretofore, it is plain that Pola Patton could not have been within the United States until August 10, 1914, because prior thereto she had been excluded from the United States. The statute uses the word "entry," and it is suggested that "entry" may mean the date of the arrival of the vessel at the port. The word "entry," however, was used with care.

In section 13 of the act (section 4289¼gg) it is provided that all aliens "arriving by water" shall be listed in convenient groups. Under section 15 (section 4289¼hh) it is provided that:

"Upon the arrival at a port of the United States of any vessel bringing aliens it shall be the duty of the * * * immigration officials to go or to send competent assistants to the vessel and there inspect all such aliens, or said immigration officials may order a temporary removal of such aliens for examination at a designated time and place. * * *"

In sections 19 and 20 (sections 4289¼jj, 4289¼k), however, and in other sections, such as section 23 (section 4289¼ll), such expressions as "arrival at a port" are not found, but the word "entry" is used, manifestly to distinguish situations where entry is something different from mere physical arrival at the port.

For the sake of argument, it may be assumed (although not decided) that, where an alien is lawfully admitted, the date of the official action admitting such alien is the date of his entry into the country. Where, however, the entry of the alien is concerned with any of the matters dealt with in sections 19 and 20 of the act, it is plain that the Congress had in view the entry after the alien was free from restraint, so that he could physically enter the country either openly or surreptitiously. In the case at bar Pola Patton did not physically enter the United States until August 10th, and it is from that date that the statutory limitation of five years began to run.

Our attention has been called to a recent decision of the Circuit Court of Appeals for the Third Circuit in Hughes, Commissioner, v. Tropello, 296 Fed. 306. Apparently, the learned court differs from

this court in certain respects dealt with in U. S. ex rel. David v. Tod and U. S. ex rel. Schnirmacher v. Tod (C. C. A.) 289 Fed. 60. We have carefully examined the subject-matter again, and adhere to our views expressed in our opinion in the David Case.

Sections 20 and 21 of the act of 1907 had no provision such as that in section 20 of the act of 1917, to the effect that:

"If deportation proceedings are *instituted* at any time within five years after the entry of the alien. * * * "

The prior statute in this regard made no reference to the institution of the deportation proceedings. Section 19 of the former act did not contain any statutory limitation, and the deportation statutory limitation was found in sections 20 and 21. In the act of 1917, here applicable, both sections must be considered, as was fully pointed out in the opinion in the David Case, supra.

To construe the statute otherwise would lead to results which we feel confident were never contemplated by the Congress when it enacted the act of 1917. One illustration is, perhaps, sufficient. A deportation proceeding might be instituted, as it has been here, within the five years. Resort to the courts might then be had, as in the case at bar, and after the court proceedings had been ended more than five years might have elapsed as in the present case. We cannot believe that the Congress intended, in such circumstances, that the power and authority to deport would cease because the time accorded to the alien in which to have his day in court had run beyond the five years, although the proceeding had been instituted within the five years.

Under consideration of all the points called to our attention in the careful briefs of both counsel, we are satisfied that the order below was right. The order is affirmed.

The mandate will be delayed for 60 days.