**UNITED STATES v. LAZARESCU.**

No. 22353.

United States District Court,
D. Maryland, Criminal Division.

May 6, 1952.

772

Bernard J. Flynn, U. S. Atty., Thomas G. Gray, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Jack H. Hantman, New York City, for defendant.

CHESNUT, District Judge.

In this case the defendant was indicted by the Grand Jury for the District of Maryland on February 15, 1952 for violation of 8 U.S.C.A. § 180(a). Section 180(a) provides (in material part) as follows:

"(a) If any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after March 4,

1929, and if he enters or attempts to enter the United States after the expiration of 60 days after said date, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000, or by both such fine and imprisonment: *Provided,* That this section and sections 136, 154 and 180a–180d of this title shall not apply to any alien arrested and deported before March 4, 1929, in pursuance of law, in whose case prior to his reembarkation at a place outside the United States, or his application in foreign contiguous territory for admission to the United States, and prior to March 4, 1929, the Attorney General has granted such alien permission to reapply for admission. * * *

"(c) An alien subject to exclusion from admission to the United States under this section who is employed upon a vessel arriving in the United States shall not be entitled to any of the landing privileges allowed by law to seamen."

At the trial of the case on March 4 and 5, 1952, the defendant was represented by a New York lawyer, a member of the New York Bar but not a member of the Bar of this court, but appearing by special permission for the trial of the case. At the conclusion of the evidence defendant's counsel moved for a verdict of acquittal principally on the ground that the District Court of Maryland did not have venue jurisdiction of the particular case, because the government's evidence did not show that the defendant had made a physical landing from ship to shore within the District of Maryland, although the defendant on his behalf testified that while he did not go on shore in Baltimore he did land at Norfolk, Virginia, on or about September 30, 1949, and was first arrested thereafter in the United States in New York on or about October 1951. The court overruled this motion and submitted the case to the jury who found a verdict of guilty. After the verdict was rendered defendant's counsel orally moved

in arrest of judgment and for a judgment of acquittal notwithstanding the verdict.

8 U.S.C.A. § 164 provides (so far as material)—

"The district courts of the United States are invested with full jurisdiction of all causes, civil and criminal, arising under any of the provisions of this chapter. It shall be the duty of the United States district attorney of the proper district to prosecute every such suit when brought by the United States under this chapter. Such prosecutions or suits may be instituted at any place in the United States at which the violation may occur or at which the person charged with such violation may be found."

The material facts established at the trial without controversy were as follows: The defendant is an alien originally a citizen of Roumania, who, on or about the 19th day of September 1940, was ordered deported from the United States and actually so deported on or about the 22nd of September 1940. On or about the 22nd day of September 1949 he arrived, as an able bodied seaman, on board the vessel S. S. Atlantic Air, in Baltimore, Maryland. The ship had sailed from the port of Victoria, Brazil, on September 3, 1949. As required under the Act of Congress of February 5, 1917, the master of the ship submitted a list or manifest of 32 aliens employed on the vessel as members of the crew. This manifest was filed as an exhibit in the case. It shows opposite No. 23 in the left hand column the name of the defendant, Lazarescu, and in typewriting after his name it appeared that his length of service at sea had been 10 years, he was an A.B. seaman, he had entered the service of the ship on May 4, 1949 at Rotterdam, he was not to be discharged at the port of arrival, he was able to read, was 40 years of age, male sex, Roumanian race and nationality, 5′ 8″ tall and weight 180 pounds. All this data appeared in typewriting evidently prepared by the master of the ship for delivery to the Immigrant Inspector. Then appeared in handwriting in ink under the column 16 headed "Remarks" (including statement of whether alien ever ordered deported from the United States and if so, whether permission to reapply has been obtained) the notation "Never dep."; and in column 17 headed "Action of Immigrant Inspector" (this column for use of government and officials only) "adm. 3(5)." I do not recall any explanation in the evidence of the significance of the notation 3(5) and the evidence has not been transcribed; but the reference to 3(5) appears to be to the original section 3(5) of the Act of 1924, 8 U.S.C.A. § 203(5), providing that bona fide seamen shall not be regarded as immigrants.

Other required written statements of the master of the ship, constituting a part of the exhibit, showed that the vessel sailed from Baltimore to Brazil via Newport News (Norfolk) Virginia, on September 28, 1949, and that Lazarescu was then a member of the crew; and that after the arrival of the ship at Norfolk Lazarescu was discharged with 10 other seamen. At the trial the defendant testified that he left the ship at Norfolk to go to a hospital but that does not appear from the master's certificate which, however, does state that no (nil) seamen were left in the hospital at Norfolk. Defendant also testified that after a visit to the hospital in Norfolk, of very short duration, he went to Washington, D.C. to call at the office of the International Refugee Organization and then went to New York where he continued to stay until he was arrested about two years later as an alien staying in the United States illegally. He was given a hearing by the Immigration Department at which, among other things, he testified in answer to a question that he had last entered the United States about September 22, 1949 at Baltimore. He was held for deportation procedure and also held for the Grand Jury's action in this District. There was no evidence offered in the case to the effect that the defendant was legally in the United States by exercise of administrative discretion, other than the action of the Immigrant Inspector on September 27, 1949 in marking his status as "adm." (admitted). The particular Inspector was not available as a witness at the trial, the United States Attorney stating that he had been assigned elsewhere at a distant point. There was no evidence, other than the en-

try by the Inspector, whether the defendant had been specifically asked if he had ever been deported. But there was no contention that the defendant did not know that he had been so lawfully deported in 1940.

Counsel on both sides have been heard in argument on the motions now made in arrest of judgment and for judgment of acquittal notwithstanding the verdict. The contention vigorously advanced by New York counsel for the defendant is that the court lacked venue jurisdiction and also that the official entry by the Inspector that the alien was admitted established the legality of his admission into the United States for residence irrespective of the fact that he had previously been deported, and also irrespective of whether that fact was or was not inquired into by the Inspector and whether or not the defendant had, if so questioned, misrepresented or concealed the fact known to him that he had been previously deported from the United States.

Under section 164 this Maryland District Court had venue jurisdiction if the violation occurred in this District; and this depends on whether the alien seaman made an "entry" within the meaning of the statute at Baltimore on or about September 22, 1949. The defendant contends there was no entry because there was no evidence offered by the government that the defendant has actually physically set foot on land in Baltimore (or for that matter in the State of Maryland) before the ship resailed on September 28, 1949 for Norfolk, Virginia; and the defendant himself as a witness testified that he had not actually left the ship at Baltimore. On the other hand, the contention of the government is that when after inspection at Baltimore on September 22, 1949, the Immigrant Inspector "admitted" the alien seaman, that official determination constituted an entry within the meaning of the statute, whether the alien physically landed at Baltimore or not, in view of the fact that he did within a few days thereafter actually land at Norfolk and almost immediately went to Washington and then to New York where he resided for about two years before being arrested. Incidentally in passing, it is readily inferable that to get to New York from Washington

by ordinary transportation routes the alien must have physically passed through Maryland, there being no evidence to the contrary.

Neither counsel in the case, nor the court by its own independent extended research, has been able to find any judicial precedent on this precise point. It has therefore been necessary for the court independently to make a comprehensive survey of the immigration statutes of the United States and the regulations of the Department of Immigration to understand the meaning of the term "entry" as contained in the statute. After doing so, I reach the conclusion that the contention of the government on this point is correct.

The immigration statutes are to be found in 8 U.S.C.A. Those particularly in point here are as follows: By section 136 it is provided "The following classes of aliens shall be excluded from admission into the United States:"—Subsection j reads—

"Persons who have been excluded from admission and deported in pursuance of law, and who may again seek admission within one year from the date of such deportation, unless prior to their reembarkation at a place outside the United States or their attempt to be admitted from foreign contiguous territory the Attorney General has consented to their reapplying for admission".

As previously noted, section 164 prescribes the venue for the prosecution of violations of chapter 6 of title 8. Section 165 forbids masters of vessels arriving in the United States from any foreign port or place to knowingly sign on the ship's articles any alien with intent to permit him to land in the United States in violation of the laws regulating the immigration of aliens. Section 166 forbids permitting alien seamen excluded from admission to land in the United States except temporarily for medical treatment, or pursuant to such regulations as the Attorney General may prescribe for the ultimate departure, removal or deportation of such alien from the United States. Section 167 provides that the master of any vessel arriving from a foreign port must detain alien seamen until the immigration officer in charge at the port of

arrival has inspected such seamen. Section 168 provides that it shall be unlawful to pay off or discharge alien seamen unless they are duly admitted; but in case the alien intends to re-ship on board another vessel bound to a foreign port he shall be allowed to land for the purpose of so re-shipping under regulations prescribed, and in that case may be paid off and discharged and permitted to remove his effects provided due notice of such proposed action be given by the master or the seaman himself to the principal immigration officer in charge at the port of arrival.

Section 171 provides for the preparation and submission to the Immigrant Inspector of the crew list previously mentioned. Section 173 defines various terms used in the statute, including "The term 'seaman' shall include every person signed on the ship's articles and employed in any capacity on board any vessel arriving in the United States from any foreign port or place." The term "entry" is not included in the definitions. Section 180, subsection (a), as heretofore noted, provides punishment for aliens who reenter the United States after prior deportation and subsection (c), also above noted, provides that an alien seaman subject to exclusion shall not be entitled to any of the landing privileges allowed by law to seamen. Section 180a provides penalties for the entry of an alien at an improper time or place, eluding examination or inspection, and misrepresentation and concealment of facts. Section 180b provides for deportation of an alien sentenced to imprisonment. Section 180d provides definitions of other terms not here in point, and section 181 provides for reentry of deported aliens on permission granted by the Attorney General, also not here involved.

In addition to the statutory law the 1949 Edition, Code of Federal Regulations, title 8, Aliens and Nationality, contains 177 closely printed regulations affecting the administration of the immigration laws. Those particularly relevant here are contained in Part 120—Alien Seamen, pp. 68 et seq., and more especially section 120.2 which defines who is a bona fide alien seaman, who, under section 3 (sub. 5) of the Act of 1924, is exempt from the class of immigrants under the statutory language "a bona fide alien seaman serving as such on a vessel arriving at a port of the United States and seeking to enter temporarily the United States solely in pursuit of his calling as a seaman," and section 120.21 which provides (p. 71):

"Alien seamen seeking entry in pursuit of calling; when ordered detained; waiver of crew list visa: (a) Any alien who upon arrival establishes that he is a bona fide seaman as defined in section 120.2, is admissible as a nonimmigrant under section 3(5) of the Immigration Act of 1924 and is not inadmissible under the other provisions of this part and of Part 175 of this chapter, may be temporarily admitted for such period of time as the examining immigrant inspector shall designate, not to exceed, however, the time the vessel on which the alien arrives remains in the United States and in no event to exceed 29 days, if * * *".

There follow more detailed regulations not applicable here.

From this review of the statutes and regulations it is found that when a vessel arrives in a port of the United States from a foreign port it is the duty of the master to prepare and present a list of the crew to the Immigrant Inspector and all seamen must be detained on the ship until they have been duly inspected and after such inspection it is the duty of the Inspector to determine in accordance with the immigration laws whether the seaman is a bona fide seaman and entitled to landing privileges at the port for the period of time permitted by the regulations. If the Inspector ascertains that the seaman is a bona fide seaman, has not previously been refused admission or previously deported, or otherwise not admissible under the statutes and regulations, according to the evidence in his case, he so notes on the crew list; and thereupon the seaman is entitled to shore leave and is free to leave the ship for the time mentioned. It will further be noted that the law and regulations apply only to ships arriving from foreign ports and not other ports of the United States and the inspection and determination of the admissibility of alien seamen is to be made

at the first port of arrival in the United States. It also appears from the evidence in this case with regard to the custom and administrative practice that where a ship arrives at a port of the United States from a foreign port and thereafter re-sails for a foreign port before touching at another port in the United States, there is no re-inspection as to the status of the alien seaman at the latter port and therefore the alien seamen if duly admitted after inspection at the first port of arrival in the United States is free to land there or at any other port of the United States enroute to a foreign port. The only apparent exception to this latter statement seems to be in the special case provided for in section 170 of title 8 regarding removal from ships and treatment in hospitals of alien seamen afflicted with certain diseases. See also title 8, Code of Federal Regulations, Part 120—Alien Seamen—§ 120.5, p. 69.

■ I think it is evident from this survey of the law and regulations that it was the intent of Congress that the status of an alien seaman should be determined after inspection at the first port of entry, and that the determination by the Inspector of his admissibility then and there is *entry* into the United States within the meaning of the statutes. While there is no clear judicial precedent for this construction it appears from the evidence of Mr. Frank, the local adjudications officer of the Immigration Department, that view is in accord with the administrative custom and practice. Thus it has been held by the Board of Immigration Appeals (File 56074/426, June 3, 1941) that a seaman admitted after inspection at the port of arrival from a foreign port has entered on the date of such admission and is subject to deportation even if he chooses to remain on the ship in port longer than the time permitted by the regulations. In that case an Italian seaman arrived at the port of Baltimore on May 9, 1940, on the SS Clara. He was duly inspected there and admitted as a bona fide alien seaman. Subsequently the seaman sailed with the ship to Savannah where the ship was detained for nearly a year. Apparently the seaman continued to remain in the service of the ship until he was arrested on or about March 1941 as an alien seaman who had remained longer than permitted by the law or regulations. The precise point before the Board was whether the seaman had remained longer than permitted by the regulations which, at that time, allowed the seaman to remain for sixty days. The attorney for the seaman contended to the contrary, saying in his brief:

"Up to the present time the respondent has never made any 'entry' into the United States within the meaning of the immigration laws, since his stay on board the ship was a stay on the soil of the country of the ship's flag and since his presence on United States soil is now involuntary and only because of his being detained."

But the Board concluded that the alien seaman was subject to deportation because he had remained in the United States longer than permitted by the regulations and specifically found, among other things,—

"that the respondent last entered the United States at the port of Baltimore, Maryland, on May 9, 1940, Ex SS 'Clara' as a seaman and was admitted for a period not to exceed 60 days".

In the course of its opinion the Board referred to a regulation which, as then worded, read:

"Arriving in the United States from any foreign port or place means arriving in the United States, and any waters, territory or other place subject to the jurisdiction thereof, except the Isthmian Canal Zone and the Philippine Islands, from any port or place in a foreign country, in the Canal Zone or Philippine Islands. * * *."

And as to this, the Board said:

"We are of the opinion that this definition is sufficiently broad to include the respondent's entry into the United States."

The same regulation with only changes in phraseology not here material, now appears as section 120.3, title 8, 1949 Ed. Code Federal Regulations. And it is also to be noted

that section 175.41, subparagraph (j) of the same Code, defines "entry" as follows:

"The term 'entry into the United States' means any entry by land, water, or air from any place outside of the United States into any place included within the United States or from any outlying possession of the United States into the continental United States or from the continental United States into any outlying possession, or from one outlying possession into another, or from the Canal Zone into the continental United States or an outlying possession, or into the Canal Zone from any place in the United States."

In United States ex rel. Patton v. Tod, 2 Cir., 297 F. 385, one of the questions considered was the date of entry of an alien passenger with regard to the running of the five-year period of limitations under section 19 of the Act of February 5, 1917, 8 U.S. C.A. 155. The alien passenger arrived in this country on the SS Batavia on July 6, 1914. Upon medical examination she was certified to be an imbecile and excluded. Thereafter on August 6, 1914, on account of war conditions, the Acting Secretary of Labor directed that she be temporarily admitted under bond. August 10, 1914 was the date of her actual release from Ellis Island. On August 6, 1919 a warrant for her arrest was issued and a hearing ordered to enable her to show cause why she should not be deported. The court held that the statutory limitation began on August 10, 1914, the date that the alien was *actually freed from restraint at Ellis Island* so that she could physically enter the country. In so holding, the court through Circuit Judge Mayer by way of dicta only, made 297 F. at page 396, the following statement more particularly relevant to the situation here: .

"For the sake of argument, it may be assumed (although not decided) that, where an alien is *lawfully* admitted, the date of the official action admitting such alien is the date of his entry into the country." (Italics supplied.)

The significance to the instant case of underscoring the word "lawfully" in the above quotation from the opinion in the Tod case, will be apparent on reading the opinion in that case particularly page 396. Of course the date of arrival of a foreign ship is not necessarily the date of entry for passengers or crew, because they must be inspected to determine their admissibility under the immigration laws. If any passenger or seaman is not admitted by the Inspector he or they ordinarily must be detained on board the vessel, unless for special reasons permitted to temporarily land. Thus if, in the instant case, the Inspector had been informed that Lazarescu had previously been deported it is clear enough that he should have been detained on board the ship and in that event, of course, his arrival here in the port would not have constituted an entry. But when the passenger or seaman is admitted by the Inspector he is then entirely free to go on shore at his pleasure, and his admission by the Inspector constitutes an entry within the meaning of the immigration statutes. In addition, it may be said that there are reasons of practical importance for this view in the administration of the immigration laws. The official records as to passenger and crew are apparently kept at the first port of arrival where the passengers and crew are inspected. As the passenger or seaman is free to land when admitted it is naturally assumed by the Immigration Department that he has so landed and ordinarily there would be no record of the time of his actual landing other than the official list completed by the Inspector after inspection, and retained in the port where the ship first arrived from a foreign port. And with respect to seamen especially, this official record is of importance in determining whether the seaman who has been so admitted has overstayed his leave under the regulations. Many seamen do in fact overstay their time, as the considerable number of deportation cases on that account in this court and the evidence of immigration personnel as witnesses clearly shows. The importance of the regulation limiting the time that an alien seaman may remain was emphasized by the Board in the case above mentioned where it was said: "Without it a practicable control over the thousands of aliens who annually enter this country as seamen would be impossible."

In opposition to this view counsel for the defendant cites Delgadillo v. Carmichael, 332 U.S. 388, 68 S.Ct. 10, 92 L.Ed. 17; Di Pasquale v. Karnuth, 2 Cir., 158 F.2d 878, and Carmichael v. Delaney, 9 Cir., 170 F. 2d 239, to the effect that an *unintentional* actual or physical entry will not constitute a legal entry within the meaning of the statute. But such cases are not applicable here because it was not the contention of the defendant that he entered the United States inadvertently or unintentionally; nor was there any evidence to that effect. It is true that there was some statement or suggestion by the defendant that he left the ship at Norfolk to go to a hospital, but I do not recall corroborating evidence to show that he in fact did visit a hospital or that he made any request to the immigration officials there for leave to stay in the United States beyond the 29 days for the purpose of re-shipping as a seaman. On the contrary the defendant's evidence was that his call at the hospital was of very limited duration and that very promptly thereafter he went to Washington for the purpose of seeing some one at the International Refugee Organization, and promptly thereafter went to New York where he continued to reside for a period of two years before his arrest and proceedings for deportation.

■ I think it unnecessary to discuss at any length the contention of defendant's counsel that the action of the Immigrant Inspector at Baltimore in admitting the defendant as an alien seaman was final and binding on the United States. It is not disputed that the defendant had in fact been deported in 1940 and of course knew that to be the case. Nor is there any evidence that he voluntarily disclosed this personally known fact to the Inspector. On the contrary it affirmatively appears by notation on the crew list that the defendant had never been deported. In these circumstances it seems idle to contend that the decision of the Inspector based on facts known to the defendant but unknown to the Inspector and misrepresented to or concealed from him by the defendant could constitute a basis for proper legal entry of the defendant. Counsel for the defendant also argued that the Inspector in admitting the defendant as an alien seaman was exercising authority delegated to him by the Attorney General, and that because the Attorney General under the statutes had the power to grant the alien permission to re-apply for admission, it must be assumed that the official action by the Inspector was correctly based on such action. But there was no evidence that the Attorney General had granted such permission nor indeed that he had ever been requested to do so in the case of this alien. Nor was it necessary for the government to prove the negative in this respect because under section 180(a) the proviso constitutes an exception which need not be affirmatively pleaded in the indictment. And perhaps even more importantly, it will be noted that the two elements of the crime punished by 180(a) are (1) prior deportation and (2) entry or attempt to enter the United States.

■ For these reasons I conclude that the defendant's motions in arrest of judgment and for acquittal notwithstanding the verdict be and are hereby overruled.

■ The defendant has also moved for a new trial principally on the ground that the court erroneously admitted evidence by Mr. Frank, local adjudications officer of the Immigration Department. But I think his evidence was clearly admissible in view of the defendant's contentions at the trial. His evidence related principally to the customs and practice of the Immigration Department. It consisted largely in calling the attention of the court to some of the relevant statutes and regulations as well as to the custom and practice of the Department with respect to the ordinary course of business in handling the crew list referred to and the various entries thereon. In other words, the evidence given by the witness was in the nature of enabling the court to understand the point of law involved under the statutes and regulations and was not in any important part factual with respect to matters to be passed on by the jury. The precise point involved, as has been noted, was unprecedented and at the trial of the case time did not suffice to enable the judge to make the extensive survey of the immigration statutes and regulations which has now been done and largely set out in this

opinion. In view of the conclusion reached by the court as to the point of law involved as expressed in the charge to the jury, and now confirmed after fuller study of the problem, it is not apparent how or why the evidence of Mr. Frank, even if not strictly admissible on the rules of evidence, could be regarded as material or prejudicial to the defendant, unless the court's conclusion as to the law is erroneous, in which event also the evidence itself would seem unimportant. The motion for a new trial is, therefore, also overruled.

Since the argument on the motions counsel for the government has raised in his brief a procedural point not made at the argument. He says that the motion now made for acquittal notwithstanding the verdict is not in accordance with criminal rule No. 29(b), 18 U.S.C.A. because at the trial the motion for acquittal was made at the close of the government's case but not re-submitted at the end of the whole case, and therefore cannot properly be entertained now. In support of this point he cites Mosca v. United States, 9 Cir., 174 F.2d 448. As the stenographer's notes of the trial have not yet been transcribed, I have not thought it necessary to consider this point so recently made, in view of the conclusion heretofore reached.